HIGGINS *v.* BROWN, *Judge, et al.*

No. 23.  Decided March 9, 1908.

(94 Pac. 703.)

1.  JURISDICTION—Territorial Courts—Admission of State—Transfer of Causes. Sections 16 and 20, inclusive, of the enabling act for Oklahoma, Act June 16, 1906, c. 3335, 34 Stat. 276 277, as amended March 4, 1907, c. 2911, 34 Stat. 1286, 1287, when concurred in by the state of Oklahoma by the adoption of sections 27 and 28 of the Schedule to the Constitution, being a proper exercise of power by the Congress under article 4 sec. 3, of the Constitution of the United States, are valid.

2.  SAME—Pending Indictment for Murder. An indictment for the crime of murder, alleged to have been committed within the jurisdiction of the United States court for the Northern District of the Indian Territory, and pending in said court on the admission of the state into the Union, is cognizable in the district court of the state, as its successor, in the county in which the offense was committed.

3.  MANDAMUS—When Writ Issues. A writ of mandamus is subject to the legal and equitable discretion of the court, and it ought not to be issued in cases of doubtful right. But it is the only adequate mode of relief where an inferior tribunal refuses to act upon the subject brought properly before it.

(Syllabus by the Court.)

Application of Elmer Higgins for a writ of mandamus to T. L. Brown, judge of the Second Judicial Circuit, and H. Stephens, sheriff. Writ granted, on condition.

On the 18th day of December, 1907, the relator instituted this action in this court, alleging that he was in the custody of the United States marshal for the Eastern District of Oklahoma. That therefore, to wit, on the 9th day of May, 1906, he was indicted in the United States court for the Northern District of the Indian Territory, at Claremore, charged therein with having, on the 10th day of April, 1906, killed one John Hancock in such a manner as to constitute the crime of murder, and upon the return of the indictment he was committed by proper order of said court to the federal jail at Vinita in said district, and that he has ever since said time remained in said jail, and since the admission of the state into the Union he has been in the custody of the United States marshal of said court. That on the 3rd day of December,

1907, he filed this petition in the United States court for the Eastern District of Oklahoma, praying for his release and discharge, and that on the 4th day of said month the judge of said court issued an order directing the marshal to deliver relator over to the proper officers of said district court of the Second judicial district in and for Rogers county. Thereafter, in compliance with said order, said marshal offered to deliver said relator to the respondent Hiram Stephens, sheriff of Rogers county, and that as such sheriff he refused and declined, and still refuses and declines,, to receive relator into his custody. Further, that said T. L. Brown, as judge of the said court, refused to receive and entertain jurisdiction in said cause against the relator, and refused to permit the same to be filed and docketed and become a part of the records of said court. Relator further says that by reason of the refusal of said respondent Hiram Stephens, as sheriff, to receive him into custody, and by reason of said respondent T. L. Brown, judge of said district, refusing to entertain jurisdiction of said cause, this relator is unable to have his cause set for trial, and unable to have bond fixed for his appearance in said court, and that he has no adequate remedy at law to have his rights determined in the premises. Wherefore he prays for a peremptory writ of mandamus to issue from this court, directed to the said respondents, requiring them to take proper action in the premises.

The respondents and the relator, by written stipulation filed in this court on the same date of said petition, agreed that said relator is confined in the United States jail at Vinita in the custody of the United States marshal for said district, by virtue of an indictment regularly returned to the United States court for the Northern District of the Indian Territory, at Claremore, on the 9th day of May, 1906, charging relator with the crime of murder. Further, that at the time of the admission of said state into the Union the cause was pending in the United States court for the Northern District of the Indian Territory, at Claremore, now the county seat of Rogers county, Okla. That on the 4th day of December, 1907, relator secured an order from the judge of the United States court for the Eastern District, directing the United

States marshal for said district to deliver relator to the proper officers of the district court of the Second judicial district of saia state for Rogers county. In compliance with said order said relator was tendered to said respondent sheriff, and said sheriff refused to accept said relator on the grounds that the district court of said district had no jurisdiction over said relator, and therefore he was not a proper person to be received into custody by the said officers. That the said T. L. Brown, judge of the said district, refused to entertain jurisdiction of the said relator, and still refuses to, on the ground that said district court was without jurisdiction to hear and determine said cause or make any order therein. That the relator is now in the United States jail at Vinita in the Eastern District of Oklahoma, awaiting action on the part of the sheriff to receive said relator into custody, and that the said relator cannot obtain a hearing on said cause on an application for bail or fix the date of hearing of said cause against him.

*Sidell & Shipman* and *Leahy & Scott,* for the relator.

*Charles West, Atty. Gen.,* and *W. C. Reaves,* for respondents.

WILLIAMS, C. J. (after stating the facts above). The question is raised as to whether or not Congress, with the concurrence of the state, could provide that the state courts, as successors to the territorial courts, should have jurisdiction to proceed with the final determination or render final judgments in criminal cases, not of a federal character, pending and not finally disposed of, in the district courts of the territory of Oklahoma or in the United States courts in the Indian Territory.

The following states were admitted into the Union without any express provision in the respective enabling acts or acts of Congress for the same to be admitted into the Union, relative to pending cases, not of a federal nature, except as hereinafter stated, and without any express reference as to crimes committed prior to the date of the admission of the state into the Union where prosecutions had not been begun:

Vermont, 1791; Kentucky, 1792; Tennessee, 1796; Ohio,

1803; Louisiana, 1812; Indiana, 1816; Mississippi, 1817; Illinois, 1818; Alabama, 1819; Maine, 1820; Missouri, 1820; Arkansas, 1836; Michigan, 1837; Texas, 1845; Florida, 1845; Iowa, 1846; Wisconsin, 1848; California, 1850; Minnesota, 1858; Oregon, 1859; Kansas, 1861; West Virginia, 1862; Nevada, 1864; Nebraska, 1867; Colorado, 1876; Montana, 1889; North Dakota, 1889; South Dakota, 1889; Washington, 1889; Idaho, 1890; Wyoming, 1890; Utah, 1896.

Florida: Section 1 of chapter 17 of an act to regulate the exercise of the appellate jurisdiction of the Supreme Court of the United States, in certain cases, and for other purposes, Act. Feb. 22, 1847, c. 17, 9 Stat. 128, provides:

"That all and singular the records of the proceedings in the several cases which were pending in the superior courts of the late territory of Florida, under and by virtue of the act of Congress of the twenty-third of May, eighteen hundred and twenty-eight, entitled 'An act supplementary to the several acts providing for the settlement and confirmation of private land claims in Florida,' and under and by virtue of an act entitled 'An act to provide for the final settlement of land claims in Florida,' approved twenty-sixth May, eighteen hundred and thirty, and in the several cases which were pending in the Court of Appeals of the same territory, on the 3rd day of March, in the year of our Lord one thousand eight hundred and forty-five, and all and singular the records of the proceedings in the several cases in which judgments or decrees had been rendered in the said courts on or before that day, and from which writs of error could have been sued out or appeals could have been taken, or from which writs of error had been sued out or appeals had been taken, and prosecuted to the Supreme Court of the United States, according to the laws of the United States, which were in force on the said third day of March, in the year of our Lord one thousand eight hundred and forty-five, shall, from and after the passing of this act, be transferred to and deposited in the District Court of the United States for the District of Florida."

Section 3 of said act further provides:

"And be it further enacted, that in all cases in which judgment or decrees have been rendered in the said superior courts or Court of Appeals of the late territory of Florida, and from which

writs of error have been sued out or appeals have been taken to the Supreme Court of the United States, the said Supreme Court shall be, and is hereby, authorized to hear and determine the same, and the mandates of the said Supreme Court for the execution of the judgments or decrees so to be rendered by them and all other writs which may be necessary in the exercise of the appellate jurisdiction of the said court in such cases, shall be directed to the District Court of the United States for the District of Florida; and the said District Court shall cause the same to be executed and obeyed."

Section 4 of said act further provided:

"And be it further enacted, that the District Court of the United States for the District of Florida shall take cognizance of all cases which were pending and undetermined in the said superior courts, under and by virtue of the act of Congress of the twenty-third May, eighteen hundred and twenty-eight, entitled 'An act supplementary to the several acts providing for the settlement and confirmation of private land claims in Florida,' and under and by virtue of an act entitled 'An act to provide for the final settlement of land claims in Florida,' approved twenty-sixth May, eighteen hundred and thirty, and all cases which were pending and undetermined in the Court of Appeals of the late territory of Florida, and from the judgments or decrees to be rendered in which writs of error could have been sued out or appeals could have been taken to the Supreme Court of the United States, under the laws which were in force on the third day of March, in the year of our Lord one thousand eight hundred and forty-five, and shall proceed to hear and determine the same; and from the judgments or decrees to be rendered by the said District Court, writs of error may be sued out or appeals may be taken to the Supreme Court of the United States, in the same manner as if such judgments or decrees had been rendered in the Court of Appeals of the territory of Florida; and the mandates and all writs necessary to the exercise of the appellate jurisdiction of the said Supreme Court in such cases shall be directed to the District Court of the United States for the District of Florida, and the said District Court shall cause the same to be duly executed and obeyed."

Section 5 further provides:

"And be it further enacted, that in all cases not legally transferred to the state courts in which judgments or decrees have been

rendered in the superior courts or Court of Appeals of the late
territory of Florida from which writs of error could have been
sued out or appeals could have been taken to the Court of Appeals
of said territory, or to the Supreme Court of the United States,
under the laws which were in force on the third day of March, in
the year of our Lord one thousand eight hundred and forty-five,
and in which writs of error have not hitherto been sued out or ap-
peals have not hitherto been taken, there shall be allowed to the
parties in the said causes the term of one year from and after the
passing of this act, for suing out such writs of error or taking such
appeals to the Supreme Court of the United States, which shall
have jurisdiction to review the same."

Section 6 of said act further provided:

"And be it further enacted, that any unfinished business or
proceedings now remaining or pending before the judge of the
superior court at St. Augustine, as a commissioner under and by
virtue of the 'Act for the relief of certain inhabitants of East
Florida,' approved twenty-sixth June, eighteen hundred and thirty-
four, or under any other act granting special powers or imposing
special duties upon said judge be and the same are hereby trans-
ferred to the judge of the District Court of the District of Florida,
to be proceeded in and finished, or decided, in the same manner
provided for by law; and the said District Judge shall have, exer-
cise and possess the same duties, powers, and rights, which have
by virtue of the act of twenty-sixth June, eighteen hundred ana
thirty-four aforesaid, or otherwise, been possessed and exercised
by the said judge of the superior court of St. Augustine, so far as
may be necessary to enable the said District Judge to determine
and finish any matter, business or proceedings now pending and
undetermined before the judge of the superior court aforesaid, by
virtue of any such special act."

Michigan: Section 7 of said act further provided:

"And be it further enacted, that all and singular the provi-
sions of this act, so far as may be, shall be, and they are hereby,
made applicable to all cases which were pending in the supreme or
other superior courts of and for the late territory of Michigan at
the time said state was admitted as a state into the Union, and to
all cases in which judgments or decrees have been rendered in said
supreme or superior court of said late territory of Michigan, and
not hitherto removed as aforesaid by writ of error or appeal."

Blanket provision: Section 1 of chapter 12, of Act Feb. 22,

1848, 9 Stat. 211, being an act supplementary to the act entitled "An act to regulate the exercise of the appellate jurisdiction of the Supreme Court in certain cases, and for other purposes," provides as follows:

"* * * That all and singular the provisions of the act entitled 'An act to regulate the exercise of appellate jurisdiction of the Supreme Court in certain cases, and for other purposes,' approved February twenty-second, eighteen hundred and forty-seven, to which this is a supplement so far as may be, shall be, and they hereby are, made applicable to all cases which were pending in the Supreme Court or other superior court of and for the late territory of Iowa at the time said territory was admitted into the Union as a state, and to all cases in which judgments or decrees have been rendered in said supreme or superior court of the said late territory of Iowa, and not hitherto removed as aforesaid by writ of error or appeal."

Section 2 of said act is as follows:

"* * * That all and singular the provisions of the said act to which this is a supplement, so far as may be, shall be and they hereby are made applicable to all cases which may be pending in the supreme or other superior court of and for any territory of the United States which may hereafter be admitted as a state into the Union at the time of its admission, and to all cases in which judgments or decrees shall have been rendered in such supreme or superior court at the time of such admission, and not previously removed by writ of error or appeal."

Iowa: Section 3 of said act is as follows:

"* * * That all cases, together with all process, records, orders, judgments, decrees, and proceedings of federal character or jurisdiction, and not legally transferred to the state courts of the state of Iowa, pending prior to and at the time of the admission of the said state of Iowa into the Union, in the district or supreme courts of the said territory of Iowa, are hereby transferred to the District Court of the United States for the District of Iowa; and it shall be the duty of the respective clerks of the said courts of the said territory of Iowa, or their successors in office, with whom the records and proceedings of said cases may be found, upon application by any person or persons interested therein, to make and certify a full and complete copy of the records thereof, and transmit the same, together with all the original process, pleadings and other papers filed in such case or cases, and which may be removed

without mutilating the records of said courts, to the clerk of the District Court of the United States, and when the said records, papers and proceedings shall be thus certified to the said last-mentioned court, its jurisdiction shall be deemed as full and complete as that of the court in which the said case originated, had been prior to the said admission of the state of Iowa. or as if the said case had been originally instituted in said District Court of the United States."

Wisconsin: Act May 29, 1848, c. 50, 9 Stat. 233:

"Sec. 5. And be it further enacted, that the clerks of the district courts of the territory of Wisconsin, shall, before their term of office expires, certify under seal, and transmit to the clerk of said courts, all records of all unsatisfied judgments, and of suits pending in said courts respectively, attaching thereto all papers connected therewith, in all cases arising under the laws or Constitution of the United States, or to which the United States shall be a party; and they shall forward the same to the clerk of said district court of the state of Wisconsin, who shall enter the same in his docket, and the said district court shall proceed therein to final judgment and execution, as if such suits or proceedings had originally been brought in said court."

"Sec. 6. And be it further enacted, that the clerk of the Supreme Court of the territory of Wisconsin shall deliver over to the clerks of said district court all records and papers in the office of the clerk of the said Supreme Court relating to proceedings in bankruptcy under the late bankrupt law of the United States. He shall also certify, under seal, and deliver to said clerk, all records of judgments and of proceedings in suits pending, and all papers connected therewith, in cases arising under the Constitution and laws of the United States." (Act May 29, 1848, c. 50, 9 Stat. 233.)

California: In section 11 of an act providing for the extension of the laws and the judicial system of the United States to the state of California, Act Sept. 30, 1850, found in chapter 90, 9 Stat. 521, it is provided "that all civil causes now pending in any of the courts of California, the jurisdiction of which may properly belong to the courts of the United States therein established, shall be removed to the said United States courts, either by writ of certiorari or by a transfer of the original papers with an exemplification from the record or docket entry, under the seal of the court from which they shall be removed. * * *"

Minnesota: Section 3 of an act for the admission of the state of Minnesota into the Union, Act May 11, 1858, c. 32, 11 Stat. 285, provided that "in all cases of appeal or writ of error heretofore prosecuted and now pending in the Supreme Court of the territory, the mandate of execution or order of further proceedings shall be directed by the Supreme Court of the United States to the District Court of the United States for the District of Minnesota, or to the Supreme Court of the state of Minnesota, as the nature of such appeal or writ of error may require; and each of those courts shall be the successor of the Supreme Court of the Minnesota Territory, as to all such cases, with full power to hear and determine the same, and to award mesne or final process therein."

Oregon: Act March 3, 1859 (section 4, c. 85, 11 Stat. 437), provided:

"\* \* \* That in all cases of appeal or writ of error heretofore prosecuted and now pending in the Supreme Court of the United States, upon any record from the Supreme Court of Oregon Territory, the mandate of execution or order of further proceedings shall be directed by the Supreme Court of the United States to the District Court of the United States for the District of Oregon, or to the Supreme Court of the state of Oregon, as the nature of such appeal or writ of error may require; and each of those courts shall be the successor of the Supreme Court of Oregon Territory, as to all such cases, with full power to hear and determine the same, and to award mesne or final process therein."

Kansas: Section 4 of an act for the admission of the state of Kansas into the Union, Act Jan. 29, 1861, c. 20, 12 Stat. 128, provided, "and in all cases of appeal or writ of error heretofore prosecuted and now pending in the Supreme Court of the United States, upon any record from the Supreme Court of Kansas Territory, the mandate of execution or order of further proceedings shall be directed by the Supreme Court of the United States to the District Court of the United States for the District of Kansas, or to the Supreme Court of the state of Kansas, as the nature of such appeal or writ of error may require; and each of those courts shall be the successor of the Supreme Court of Kansas Territory,

as to all such cases, with full power to hear and determine the same and to award mesne or final process therein."

Nevada:     Section 8 of the act of Congress relative to Nevada provides:

"And be it further enacted, that all cases of appeal or writ of error heretofore prosecuted and now pending in the Supreme Court of the United States, upon any record from the Supreme Court of the territory of Nevada, may be heard and determined by the Supreme Court of the United States, and the mandate of execution or of further proceedings shall be directed by the Supreme Court of the United States to the District Court of the United States for the District of Nevada, or to the Supreme Court of the state of Nevada, as the nature of said appeal or writ of error may require, and each of these courts shall be the successor of the Supreme Court of Nevada Territory as to all such cases, with full power to hear and determine the same, and to award mesne or final process therein. And from all judgments and decrees of the Supreme Court of the territory of Nevada, prior to its admission into the Union as a state, the parties to said judgments and decrees shall have the same right to prosecute appeals and writs of error to the federal courts as they would have had under the laws of the United States if this act had been passed simultaneously with the act admitting said state into the Union; provided, that said appeals shall be prosecuted and said writs of error sued out at any time before the first day of July, eighteen hundred and sixty-six."

Section 9 of the same act further provides:

"And be it further enacted, that no possessory action between individuals in any of the courts of the United States for the recovery of any mining title, or for damages to any such title, shall be affected by the fact that the paramount title to the land on which such mines are, is in the United States, but each case shall be adjudged by the law of possession." (Act Feb. 27, 1865, c. 64, 13 Stat. 440.)

Nebraska:     Act March 25, 1867, c. 7, § 6, 15 Stat. 5, provides:

"That all cases of appeal or writ of error, heretofore prosecuted, and now pending in the Supreme Court of the United States upon any record from the Supreme Court of the territory of Nebraska, or which may hereafter be prosecuted from said

court as herein allowed, may be heard and determined by the Supreme Court Court of the United States, and the mandate of execution or of further proceedings shall be directed by the Supreme Court of the United States to the Circuit or District Court of the United States for the District of Nebraska, as the nature of said appeal or writ of error may require, and each of those courts shall be the successor of the Supreme Court of Nebraska Territory as to all such cases, with full power to hear and determine the same, and to award mesne or final process therein. And from all judgments and decrees of the Supreme Court of the territory of Nebraska, prior to its admission as a state the parties to said judgments and decrees shall have the same right, to prosecute appeals and writs of error to the federal courts as they had under the laws of the United States prior to the admission of the state of Nebraska into the Union."

Colorado: Section 5 of an act to further the administration of justice in the state of Colorado, Act June 26, 1876, c. 147, 19 Stat. 62, provides:

"That all cases of appeal or writ of error heretofore prosecuted and now pending in the Supreme Court of the United States upon any record from the Supreme Court of the territory of Colorado, or that may hereafter be lawfully prosecuted from said court, may be heard and determined by the Supreme Court of the United States, and the remand of execution or of further proceedings shall be directed by the Supreme Court of the United States to the Circuit or District Court of the District of Colorado , or to the Supreme Court of the state of Colorado, as the nature of the case may require; and each of said last-mentioned courts shall be the successor of the Supreme Court of Colorado Territory as to all such cases, with full power to proceed with the same and to award mesne or final process therein."

Section 6 of said act provides:

"That from all judgments and decrees of the Supreme Court of the territory of Colorado prior to its admission as a state, the parties to such judgments shall have the same right to prosecute appeals and writs of error to the Supreme Court as they shall have had by law prior to the admission of said state into the Union."

Section 8 of the same act provides:

"That in respect of all cases, proceedings, and matters pending in the supreme or district courts of the territory of Colorado at the time of the admission of said state into the Union, whereof

the Circuit or District Courts by this act established might have had jurisdiction under the laws of the United States had such courts existed at the time of the commencement of such cases, the said Circuit and District Courts respectively shall be the successors of said supreme and district courts of said territory; and all the files, records, and proceedings relating thereto shall be transferred to said Circuit and District Courts, respectively, and the same shall be proceeded with therein in due course of law."

Montana, North Dakota, South Dakota, and Washington: Section 22 of an act for the division of Dakota into two states, Act Feb. 22, 1889, c. 180, 25 Stat. 676, provided:

"That all cases of appeal or writ of error heretofore prosecuted and now pending in the Supreme Court of the United States upon any record from the Supreme Court of either of the territories mentioned in this act, or that may hereafter lawfully be prosecuted upon any record from either of said courts may be heard and determined by said Supreme Court of the United States. and the mandate of execution or of further proceedings shall be directed by the Supreme Court of the United States to the Circuit or District Court hereby established within the state succeeding the territory from which such record is or may be pending, or to the Supreme Court of such state, as the nature of the case may require."

"With the proviso, that the mandate of execution or of further proceedings shall, in cases arising in the territory of Dakota, be directed by the Supreme Court of the United States to the Circuit or District Court of the District of South Dakota, or to the Supreme Court of the state of North Dakota, as the nature of the case may require, and each of the circuit, district and state courts herein named shall, respectively, be the successor of the Supreme Court of the territory, as to all such cases arising within the limits embraced within the jurisdiction of such courts respectively, with full power to proceed with the same, and award mesne or final process therein, and that from judgments and decrees of the Supreme Court of either of the territories mentioned in this act, in any case arising within the limits of any of the proposed states prior to admission, the parties to such judgment shall have the same right to prosecute appeals and writs of error to the Supreme Court of the United States as they shall have had by law prior to the admission of said state into the Union."

Section 23 of said act provides:

"That in respect to all cases, proceedings and matters now pending in the supreme or district courts of either of the territories mentioned in this act at the time of the admission into the Union of either of the states mentioned in this act, and arising within the limits of any such state, whereof the Circuit or District Courts by this act established might have had jurisdiction under the laws of the United States had such courts existed at the time of the commencement of such cases, the said Circuit and District Courts, respectively, shall be the successors of said Supreme and District Courts of said territory; and in respect to all other cases, proceedings, and matters pending in the Supreme or District Courts of any of the territories mentioned in this act at the time of the admission of such territory into the Union, arising within the limits of said proposed state, the courts established by such state shall, respectively, be the successors of said supreme and district territorial courts; and all the files, records, indictments and proceedings relating to any such cases, shall be transferred to such circuit, district and state courts, respectively, and the same shall be proceeded with therein in due course of law; but no writ, action, indictment, cause or proceeding now pending, or that prior to the admission of any of the states mentioned in this act, shall be pending in any territorial court in any of the territories mentioned in this act, shall abate by the admission of any such state into the Union, but the same shall be transferred and proceeded with in the proper United States circuit, district or state court, as the case may be; provided, however, that in all civil actions, causes and proceedings, in which the United States is not a party, transfer shall not be made to the Circuit and District Courts of the United States, except upon written request of one of the parties to such action or proceeding filed in the proper court; and in the absence of such request such cases shall be proceeded with in the proper state courts."

Idaho: Same provisions as apply to Montana. Act July 3, 1890, c. 656, 26 Stat. 215.

Wyoming: Same as Idaho. Act July 10, 1890, c. 664, 26 Stat. 222.

Utah: Section 17 of an act to enable the people of Utah to form a Constitution, etc., Act July 16, 1894, c. 138, 28 Stat. 107, provides:

"That the convention herein provided for shall have the power to provide by ordinance for the transfer of actions, cases,

proceedings, and matters pending in the supreme or district courts of the territory of Utah at the time of the admission of the said state into the Union, to such courts as shall be established under the Constitution to be thus formed, or to the Circuit or District Court of the United States for the District of Utah; and no indictment, action, or proceeding shall abate by reason of any change in the courts, but shall be proceeded with in the state or United States courts according to the laws thereof, respectively. That all cases of appeal or writ of error heretofore prosecuted and now pending in the Supreme Court of the United States upon any record from the Supreme Court of said territory, or that may hereafter lawfully be prosecuted upon any record from said court, may be heard and determined by said Supreme Court of the United States and the mandate of execution or of further proceedings shall be directed by the Supreme Court of the United States to the Circuit or District Court hereby established within the said state from or to the Supreme Court of such state, as the nature of the case may require; and the circuit, district, and state courts herein named shall, respectively, be the successors of the Supreme Court of the territory as to all such cases arising within the limits embraced within the jurisdiction of such courts, respectively, with full power to proceed with the same, and award mesne or final process therein; and that from all judgments and decrees of the Supreme Court of the territory, mentioned in this act, in any case arising within the limits of the proposed state prior to admission, the parties to such judgment shall have the same right to prosecute appeals and writs of error to the Supreme Court of the United States as they shall have had by law prior to the admission of said state into the Union."

In the cases of West Virginia, Nevada, Nebraska, Colorado, North and South Dakota, Montana and Washington, Utah and Oklahoma, these states have been admitted by proclamation of the President of the United States, pursuant to the provisions of the enabling acts, and Wyoming and Idaho were admitted after they had formed Constitutions, not under an enabling act, but by act of Congress. We find that in all the states that were admitted by an act of Congress, and not by proclamation of the President, the state courts, with provisions in the schedules of their Constitutions permitting such jurisdiction, have exercised the same in cases like the one at bar and why should the state courts of Oklahoma like-

wise not exercise like jurisdiction? It undoubtedly is in accordance with the rule laid down in *Benner v. Porter,* 9 How. (U. S.) 235, 13 L. Ed. 119, being necessary for the Congress to concur in order for the jurisdiction to attach to the state courts. And unquestionably where a state had formed a Constitution and provided therein that the state courts should become the successors of like courts under the territorial form of government, and that as to criminal cases, not of a federal nature, the same should be prosecuted to final judgment in such court; that when Congress admitted such a state into the Union with such a provision in its Constitution it expressly concurred in and agreed to such provision. In the case of West Virginia, Nevada, Colorado, North and South Dakota, Montana, Washington, Utah, and Oklahoma, where the Constitutions were formed under an enabling act, and by virtue of that enabling act a proclamation was issued by the President of the United States admitting such state or states into the Union under the Constitution thus formed containing like provisions in like manner, did not the federal government concur in such provisions in like manner as if such states had been admitted directly by act of Congress? Should it be urged by counsel that the President had no such constitutional authority, he would be contending for a proposition that would be tantamount to declaring that Oklahoma was not legally in the Union of states. This court certainly will not make such a declaration—will not repudiate the power that brought it into active existence.

So far as we have been able to find from the date of the admission of Vermont in 1791 to that of Oklahoma in 1907 no provision has ever been made by express act of Congress for the prosecution of criminal offenses, not of a federal nature, where proceedings had not been instituted prior to the admission of the state into the Union, and prior to the supplemental legislation relative to Florida and Iowa in 1847 no provision has ever been made relative to pending criminal cases, not of a federal nature. It would be very salutary to consider the particular contemporaneous and subsequent practical construction of the powers of the states through their courts as successors to the territorial courts to prose-

cute to final determination pending cases or offenses committed, but where prosecutions had not been begun at the time of the admission of the state into the Union. For where there has been a particular construction which has been acquiesced in for a considerable period, considerations in favor of adhering to this construction seem to present themselves to the courts with such plausibility and force that is not easy to resist. Indeed, where a particular construction has been generally accepted as correct, and especially where this has occurred contemporaneously with the adoption of the Constitution or statute, and by those who had opportunity to understand the intention of the. instrument, it is not to be denied that the presumption exists that the construction rightly interprets the intention. And when this has been given by officers in the discharge of their official duty, and rights have accrued in reliance upon it, which would be divested by the decision that the construction was erroneous, the argument *ab inconvenienti* is sometimes allowed to have very great weight. *Stuart v. Laird,* 1 Cranch (U. S.) 299, 2 L. Ed. 115; *Martin v. Hunter's Lessee,* 1 Wheat. (U. S.) 304, 4 L. Ed. 97; *Cohens v. Virginia,* 6 Wheat. (U. S.) 264, 5 L. Ed. 257; *Bank of United States v. Halstead,* 10 Wheat. (U. S.) 51, 6 L. Ed. 264; *Ogden v. Saunders,* 12 Wheat. (U. S.) 290, 6 L. Ed. 606; *Pike v. McGoun,* 44 Mo. 491; *State c. Parkinson,* 5 Nev. 15; *Minor v. Happersett,* 21 Wall. 162, 22 L. Ed. 627; *Ex parte Reynolds,* 52 Ark. 330, 12 S. W. 570; Story on Constitutions, §§ 405-408; Cooley's Constitutional Limitations (7th Ed.) pp. 102-104.

Every state that has been admitted into the Union, with the exception of Vermont, through its constitutional convention has provided that all actions or prosecutions shall continue as if no change had taken place in the territorial form of government.

Kentucky: Constitution, Schedule, 1792:

"That no inconvenience may arise from the establishing of the government of this state, and in order to carry the same into complete operation, it is hereby declared and ordained, that all rights, actions, prosecutions, claims, and contracts, as well of individuals as of bodies corporate, shall continue as if the said government had not been established."

Tennessee: Section 1, Schedule, Const. 1796:

"That no inconvenience may arise from a change of the temporary to a permanent state government, it is declared that all rights, actions, prosecutions, claims, and contracts, as well of individuals as of bodies corporate, shall continue as if no change had taken place in the administration of government."

Ohio: Section 1, Schedule, Const. 1802:

"That no evils or inconveniences may arise from the change of a territorial government to a permanent state government, it is declared by this convention, that all rights, suits, actions, prosecutions, claims, and contracts, both as it respects individuals and bodies corporate, shall continue as if no change had taken place in this government."

Louisiana: Section 1, Schedule, Const. 1812:

"That no inconvience may arise from a change of a territorial to a permanent state government, it is declared by the convention that all rights, suits, actions, prosecutions, claims and contracts, both as it respects individuals and bodies corporate, shall continue as if no change had taken place in this government, in virtue of the laws now in force."

Indiana: Section 1, art. 12, Const. 1816:

"That no evils or inconvenience may arise from the change of a territoral government to a permanent state government, it is declared by this Constitution that all rights, suits, actions, prosecutions, recognizances, contracts, and claims, both as it respects individuals and bodies corporate, shall continue as if no change had taken place in this government."

Mississippi: Section 1, Schedule, Const. 1817:

"That no inconvenience may arise from a change of territorial to a permanent state government, it is declared that all rights, actions, prosecutions, claims, and contracts, as well of individuals as of bodies corporate, shall continue as if no change had taken place."

Illinois: Section 1, Schedule, Const. 1848:

"That all laws in force at the adoption of this Constitution, not inconsistent therewith, and all rights, actions, prosecutions, claims, and contracts of this state, individuals or bodies corporate, shall continue and be as valid as if this Constitution had not been adopted."

Alabama: Section 1, Schedule, Const. 1819:

"That no inconvenience may arise from a change of territorial to a permanent state government, it is declared that all rights, actions, prosecutions, claims, and contracts, as well of individuals as of bodies corporate, shall continue as if no change had taken place; and all process, which shall, before the third Monday in September next, be issued in the name of the Alabama Territory, shall be as valid as if issued in the name of the state."

Maine: Section 1, Schedule, Const. 1820:

"All laws now in force in this state, and not repugnant to this Constitution, shall remain and be in force until altered or repealed by the Legislature or shall expire by their own limitation."

In *Darcrow's Case,* 6 Greenl. (Me.) 148, the courts of the state of Maine assumed jurisdiction of an offense committed within the territory of that state, which was formerly a part of the Commonwealth of Massachusetts, and where the indictment was returned after Maine was erected into a state.

Missouri: Section 1, Schedule, Const. 1820:

"That no inconvenience may arise from a change of government we declare that all writs, actions, prosecutions, judgments, claims, and contracts of individuals and of bodies corporate, shall continue as if no change had taken place; and all process which may, before the third Monday in September next, be issued under the authority of the territory of Missouri shall be as valid as if issued in the name of the state."

Arkansas: Section 1, Schedule, Const. 1836:

"That no inconvenience may arise from the change of government we declare that all writs, actions, prosecutions, judgments, claims, and contracts of individuals and bodies corporate, shall continue as if no change had taken place; and all process which may be issued under the authority of the territory of Arkansas, previous to the admission of Arkansas into the Union of the United States, shall be as valid as if issued in the name of the state."

In the case of *Hudspeth v. State,* 1 Ark. 20, the defendant evidently was convicted in the city court of Little Rock prior to the admission of the state into the Union, where the defendant was prosecuted in the name of the United States. This appeal was dismissed on account of irregularities, but never an intimation that such action did not continue and survive the change from a territory to a state.

Michigan: Section 1, Schedule, Const. 1835:

"That no inconvenience may arise from a change of the territorial government to a permanent state government, it is declared that all writs, actions, prosecutions, contracts, claims, and rights of individuals and of bodies corporate shall continue as if no change had taken place in this government; and all process which may, before the organization of the judicial department under this Constitution, be issued under authority of the territory of Michgan, shall be as valid as if issued in the name of the state."

In the case of *People v. Richards,* 1 Mich. 217, 51 Am. Dec. 75, the defendants were indicted for a public offence in 1833, about five years prior to the admission of the state into the Union. The Supreme Court of the state of Michigan, as successor to the territorial appellate court, assumed jurisdiction.

Texas: Section 2, article 13, Schedule, Const. 1845, reads as follows:

"* * * * ; and all criminal prosecutions or penal actions which shall have arisen prior to the organization of the state government under this Constitution in any of the courts of the republic of Texas, shall be prosecuted to judgment and execution in the name of said state. All suits at law and equity which may be depending in any of the courts of the republic of Texas, prior to the organization of the state government under this Constitution, shall continue and remain in force as the laws of this state until they expire by their own limitation, or shall be altered or repealed by the Legislature thereof."

Section 3 also reads as follows:

"All laws or parts of laws now in force in the republic of Texas, which are not repugnant to the Constitution of the United States the joint resolutions for annexing Texas to the United States, or the provisions of this Constitution, shall continue and remain in force as the laws of this state until they expire by their own limitation, or shall be altered or repealed by the Legislature thereof."

In *Drummond v. The Republic of Texas, 2* Tex. 157, the appellant was indicted and convicted under virtue of an act to suppress gaming. A motion was made in arrest of judgment, embracing a variety of objections to the irregularity and legality of the proceedings, which motion was overruled and the cause certified

to the Supreme Court for revision. Among the grounds embraced in the motion in arrest are the following: Because said prosecution was not carried on in the name or by the authority of the republic of Texas. Mr. Justice Wheeler, speaking for the court, said:

"No prescibed form of words is necessary in order that the prosecution be carried on 'in the name and by the authority of the republic of Texas.' It is enough that the prosecution is conducted by the proper law officer, acting under the authority and conducting the prosecution in the name of the government."

In the case of *Holt v. State,* 2 Tex. 364, where the appellant was indicted at the fall term, 1844, Washington county district court, for an affray, the prosecution was pending until the fall term, 1846, after Texas had been admitted into the Union, when the accused was tried and found guilty and judgment was pronounced against him, the prosecution being then conducted in the name of the state. He subsequently prosecuted his writ of error to reverse the judgment upon the ground that the "indictment and alleged offense were both previous to the passage of the law (enacted by the state) authorizing the assessing of fines by juries." Mr. Justice Wheeler, speaking for the court said:

"This prosecution was pending at the period of the adoption of the state Constitution, and comes within the provision of the second section of article 13."

Florida: Section 1, Schedule, Const. 1838:

"That all laws or parts of laws now in force, or which may hereafter be passed by the Governor and Legislative Council of the territory of Florida, not repugnant to the provisions of this Constitution, shall continue in force until, by operation of their provisions or limitations, the same shall cease to be in force, or until the General Assembly of the state shall alter or repeal the same; and all writs, actions, prosecutions, judgments, and contracts shall be and continue unimpaired; and all process which has heretofore issued, or which may be issued prior to the last day of the first session of the General Assembly of this state, shall be as valid as if issued in the name of the state; and nothing in this Constitution shall impair the obligation of contracts, or violate vested rights, either of individuals, or of associations claiming to exercise corporate privileges in this state."

In the case of the *State v. Call,* 1 Fla. 92, the defendant was indicted, for obstructing a water course, in the superior court of Wakulla county in 1844, under the territory of Florida, and was tried and convicted prior to the admission of the state into the Union. The appeal or writ of error was dissmissed because the proper notice was not given. No intimation that there was no jurisdiction because Congress had failed to provide for the continuance of the jurisdiction of such cases was made.

Iowa: Section 3, Schedule, Const. 1846:

"All indictments, prosecutions, suits, pleas, plaints, process, and other proceedings pending in any of the courts shall be prosecuted to final judgment and execution; and all appeals, writs of error, *certiorari,* and injunctions shall be carried on in the several courts, in the same manner as now provided by law, and all offenses, misdemeanors, and crimes that may have been committed before the taking effect of this Constitution, shall be subject to indictment, trial, and punishment, in the same manner as they would have been had not this Constitution been made."

In the case of *Cook et al. v. United States,* 1 G. Greene (Iowa) 56, was a prosecution begun against the appellants upon an indictment for a riot, and a verdict and judgment was had in the Supreme Court of the state of Iowa at its July term, 1847, reversed said cause. Mr. Justice Kenny said:

"The record entry of the clerk shows that the jury found the defendants guilty only. The verdict of the jury as contained in the bill of exceptions shows that the jury found them guilty, and assessed their fine at three dollars and fifty cents, and imprisonment one hour. In the first there is error, as the jury should have assessed the fine. In the latter, there is also error, as the jury had no right to fix the time of imprisonment. In the judgement there is error, as the court, under the statute, in a case of this kind, had no right to fine the defendants. As the verdict upon the record is erroneous, it is not necessary to pass upon the other points raised by the assignment of error, or to determine whether the court had a right to amend the verdict after the jury had dispersed. If the verdict had been amended, it should appear in legal form on the record. The judgment of the court below will therefore be reversed, and the cause remanded for a new trial."

In the case of *Bonsell v. United States,* 1 G. Greene (Iowa)

112. appellant, Jacob Bonsell, was tried in the district court of Linn county, territory of Iowa, March term, 1844, on a charge of larceny for stealing a mule. A verdict of the jury impaneled and sworn to try the cause on the plea of not guilty was rendered, finding him guilty of the charge in the indictment. The judgment of the territorial court was affirmed by the Supreme Court of the state.

In the case of *State v. Douglass,* 1 G. Greene (Iowa) 550, ·the defendant was prosecuted before a justice of the peace of the territory for an assault. Tried by a jury, verdict of guilty rendered, and fine assessed at $5. The cause was then taken to the district court of the state by writ of *certiorari* and there reversed, and was then taken upon a writ of error from the district court· upon the part of the state to the Supreme Court. Whereupon the verdict of the district court was reversed, with costs, and the cause remanded.

Wisconsin: Section 1, Schedule, Const. 1848:

"That no inconvenience may arise by reason of a change from a territorial to a permanent state government, it is declared that all rights, actions, prosecutions, judgments, claims, and contracts, as well of individuals as of.bodies corporate, shall continue as if no such change had taken place, and all process which may be issued under the authority of the territory of Wisconsin, previous to its admission into the Union of the United States, shall be as valid as if issued in the name of the state."

California: Section 1, Schedule, Const. 1849:

"All rights, prosecutions, claims, and contracts, as well of individuals as of bodies corporate, and all laws in force at the time of the adoption of this Constitution, and not inconsistent therewith, until altered or repealed by the Legislature, shall continue as if the same had not been adopted."

In the case of the *People v. Daniels,* 1 Cal. 107, the defendant was indicted by a grand jury impaneled on the 30th day of August, A. D. 1849, prior to the admission of California into the Union, John W. Geary, sitting as judge of the court of the first instance, in the district of San Francisco, territory of Upper California, the defendent being charged with the crime of murder.

Hastings, C. J. for the court said:

"It will be unnecessary to enter into a detail of the proceedings in the case, from the fact that the laws of the country then in force were but imperfectly understood, and error and irregularity are found in all the proceedings of the courts, especially in criminal cases. The errors in this record are so numerous that the execution of the defendant would not be the judgment of the law, but the mere will of the court and executioner. We therefore think that the defendant ought *again* be put upon his trial upon an indictment presented by a *regular grand jury, and that the defendant be held* in custody to abide the order of the district court."

Minnesota: Section 1, Schedule, Const. 1857:

"That no inconvenience may arise by reason of a change from a territorial to a permanent state government, it is declared that all rights, actions, prosecutions, judgments, claims, and contracts, as well of individuals as of bodies corporate, shall continue as if no change had taken place; and all process which may be issued under the authority of the territory of Minnesota previous to its admission into the Union of the United States shall be as valid as if issued in the name of the state."

Oregon: Section 9, Schedule, Const. 1859:

"Crimes and misdemeanors committed against the territory of Oregon shall be punished by the state as they might have been punished by the territory if the change of government had not been made."

Kansas: Section 1, Schedule, Const. 1859:

"That no inconvenience may arise from the change from a territorial government to a permanent state government, it is declared by this Constitution that all suits, rights, actions, prosecutions, recognizances, contracts, judgments, and claims, both as respects individuals and bodies corporate, shall continue as if no change had taken place."

West Virginia: Section 8, article 11, Const. 1863:

"Such parts of the common law and the laws of the state of Virginia as are in force within the boundaries of the state of West Virginia when this Constitution goes into operation, and are not repugnant thereto, shall be and continue the law of this state until altered or repealed by the Legislature. All offenses against the laws of Virginia heretofore committed within the bounderies of

this state shall be cognizable in the courts of this state in the same manner they would if hereafter committed within this state. All civil or criminal suits or proceedings pending in the county or circuit courts of the state of Virginia, held within the said boundaries, shall be docketed and thereafter proceeded in before the circuit court of the proper county; and all such suits and proceedings pending in the supreme and district courts of appeals of the state of Virginia, if the defendant in the court below resides within the said boundaries, or the subject of the suit is land or other property situated or being therein, and the plaintiff is entitled to prosecute in this state, shall be docketed, and thereafter proceeded in before the Supreme Court of Appeals thereof."

Nevada: Section 1, Schedule, Const 1864:

"That no inconvenience may arise by reason of a change from a territorial to a permanent state government it is declared that all rights, actions, prosecutions, judgments, claims, and contracts, as well of individuals as of bodies corporate, including counties, towns, and cities, shall continue as if no change had taken place, and all process which may issue under the authority of the territory of Nevada previous to its admission into the Union as one of the United States, shall be as valid as if issued in the name of the state of Nevada."

In the case of *People v. Bonds,* 1 Nev. 31, the defendant was indicted for murder in the Third judicial district of the territory of Nevada, and tried and found guilty of murder in the second degree. At the January term, 1865, of the state Supreme Court, this cause was reversed on account of errors occurring at the trial, without any reference to the crime having been one committed and tried under the territorial government. The following is the language of the court in reversing the same: "For these reasons the judgments must be reversed and new trial ordered."

In the case of *The People v. Logan,* 1 Nev. 110, the defendant was indicted by the grand jury of Ormsby county, territory of Nevada, charging him with a public offense committed under the territory of Nevada, and a demurrer was sustained to the indictment prior to statehood, from which the territory appealed. The Supreme Court of the state, at the January term, 1865, sustained the lower court.

In the case of *The People v. Gleason,* 1 Nev. 173, the defendant, in the district court of the Third judicial district of the territory of Nevada, was indicted, charged with the crime of murder, and tried and convicted about April, 1864, prior to the admission of Nevada into the Union. An appeal was prosecuted after statehood to the Supreme Court on account of refusal of instructions as to the law governing the case. The judgment of the court below was set aside and reversed, and a new trial granted.

In the case of *Ex parte Janes,* 1 Nev. 319, in the month of April, 1864, Janes was convicted of murder in the first degree, in Storey county, territory of Nevada, and sentenced to be executed on the 2nd day of June, 1864. Before the day of execution arrived the Governor of the then territory of Nevada issued in his official capacity a paper purporting to be a commutation of the sentence of Janes, and directing him to be delivered over by the sheriff of Storey county to the warden of the territorial prison or penitentiary, and requiring the warden to hold him in prison during his natural life. By authority of this paper and none other, he was delivered over to the warden some time in 1864, and by him retained in custody. On the 3rd day of December, 1864, J. W. Nye, then acting as Governor of the state of Nevada, under the provisions of the Constitution which continued the territorial Governor in that position until the election and qualification of the new state officers issued another paper granting, or purporting to grant, a pardon to the petitioner, coupled with two conditions: First. That the pardon should not take effect for six months. Second. That the petitioner should leave the state of Nevada, and not return thereto. At the end of six months from the date of this paper the warden of the penitentiary released the prisoner, and he left the state. Upon being informed by the warden that his authority to release him had been questioned, and a request made that he would return and deliver himself up until the law governing the case could be settled, he voluntarily returned, delivered himself to the warden, and sued out this writ. The first question to determine was, was Janes originally commit-

ted to the keeping of the warden by any legal authority? Under the organic act of the territory the Governor had the power to pardon persons who had been convicted of murder. The general power to pardon carried with it the power to pardon on conditions. If a condition precedent be imposed, that condition must be performed, or the pardon never takes effect. The following was the judgment of the Supreme Court of said state:

"Under the provisions of this section the prisoner is ordered to be delivered·into the hands of the sheriff of Storey county, to be by him held until further orders of the district court of the First judicial district. Whether the original judgment directing the execution of the prisoner was sufficiently specific to have justified the sheriff in carrying the sentence into execution, need not be determined in this proceeding. Doubtless the district court can enter a sufficient judgment. We are satisfied the sheriff had no authority to release the prisoner, nor to intrust him to the custody of any other person than the jailor of Storey county,or some deputy or bailiff of the sheriff for safe keeping."

In the case of *State v. Logan*, 1 Nev. 509 (see *People v. Logan*, 1 Nev. 110), the case was again reversed on the ground that the indictment ought to have been quashed because it was found on improper evidence.

Nebraska: Section 1, Schedule, Const. 1866-67:

"That no inconvenience may arise from the change of territorial government to a state government, it is declared, that all rights, suits, actions, prosecutions, judgments, recognizances, claims and contracts, both as respects persons and bodies corporate, shall continue and be enforced as if no change had.taken place, and all laws now in force shall remain in force until altered, amended or repealed by the Legislature: Provided, wherever the word 'Territory' shall occur, it shall be construed to mean state, whenever it may be necessary in order that such laws may conform to the state government."

Colorado: Section 1, Schedule, Const. 1876:

"That all laws in force at the adoption of this Constitution shall, so far as not inconsistent therewith, remain of the same force as if this Constitution had not been adopted until they expire by their own limitation, or are altered or repealed by the General Assembly; and all rights, prosecutions, actions, claims, and con-

tracts of the territory of Colorado, counties, individuals, or bodies corporate, (not inconsistent therewith), shall continue as if the form of government had not been changed and this Constitution adopted."

In the case of *Wilson v. The People,* 3 Colo. 325, that was a case, where at the October term, 1876 after admission of the state into the Union, the defendant was indicted on the charge of murder, tried thereon, found guilty and sentenced. The crime was committed prior to the admission of the state into the Union. Without the question being raised, the judgment of the lower court was affirmed and the prisoner sentenced.

In the case of *Packer v. People,* 8 Colo. 362, 8 Pac. 564, the plaintiff was indicted, tried and convicted at the April term, 1883, of the district court of Hinsdale county for the murder of Israel Swan. The indictment charged that said murder was committed by the prisoner in Hinsdale county on the 1st of March, 1874; said Hinsdale county then being in the territory of Colorado, but at the time of the trial in the state of Colorado. The jury returned a verdict as charged in the indictment. Beck, C. J., said:

"The objection made to the concluding clause of the indictment appears to us to be wholly without merit. It was that the indictment concludes that the killing was committed against the peace and dignity of the people of the state of Colorado; whereas, say the counsel, there was no state of Colorado in existence at the time of the killing in March, 1874. True, the form of government has been changed since the latter date from the territorial form to that of a state. The views of Attorney General Urmy, that no rights were forfeited by the transition, is an answer to this whole line of argument. The same citizens who comprised the territorial government were the citizens who framed and adopted the state Constitution; and upon its taking effect they immediately became citizens of the new state. Instead of sweeping away by a dash of the pen the laws which had been made by this same citizenship, and by which the territory had been governed for many years, the whole body of laws was preserved by the Constitution as the laws of the state, both in civil and in criminal matters, until they should be amended or repealed by

the state Legislature, and other provisions made to supply their place."

Montana: Section 3, Schedule, Const. 1889:

"No crime or criminal offense committed against the laws of the territory of Montana shall abate, or be in any wise affected, by reason of the change from a territorial to a state form of government; but the same shall be deemed and taken to be an offense against the laws of the state, and the appropriate courts of the state shall have jurisdiction over and to hear and determine the same: Provided, that this section shall not in any wise be construed to change the law of the statute of limitations, or the due effect or application of the same."

In the case of the *State v.Williams,* 9 Mont. 179, 23 Pac. 335, the defendant was indicted in the district court of Custer county, May 13,1889, for the crime of rape. On the trial, the defendant objected to the sufficiency of the indictment on the ground that it did not aver that the female was "not the wife of the perpetrator" of the alleged rape. The objection was sustained by the court, and the defendant discharged. The territory reserved the question of law by exception, which appeared in the record, and appealed to the Supreme Court of the territory. At the January term, 1890, of the Supreme Court of the state, the judgment of the lower court was reversed, and the cause remanded with instructions to proceed against the defendant on said judgment.

In the case of *State v. Sullivan,* 9 Mont. 175, 22 Pac. 1088, the defendant was convicted and sentenced for the crime of robbery; the crime is alleged to have taken place about the 10th day of April, 1889. This case was tried and a conviction had thereon, and the defendant sentenced, prior to the admission of the state into the Union. On account of certain instructions given to the jury by the court, said cause was reversed and remanded for a new trial by the Supreme Court of the state.

In the case of the *State v. Thompson,* 10 Mont. 550, 27 Pac. 349, the defendant was charged with the crime of rape. The indictment was found prior to the admission of the state into the Union, alleging that on or about the 12th day of April, A. D.

1889, said crime was committed. Said cause was tried after said state was admitted into the Union, and resulted in a judgment of conviction. At its June term, 1891, the Supreme Court of the state affirmed said cause.

North Dakota: Section 1, Schedule, Const. 1889:

"That no inconvenience may arise from a change of territorial government to a state government, it is declared that all writs, actions, prosecutions, claims and rights of individuals and bodies corporate shall continue as if no change of government had taken place, and all process which may, before the organization of the judicial department under this Constitution be issued under the authority of the territory of Dakota shall be as valid as if issued in the name of the state."

In the case of *Territory of Dakota v. O'Hare,* 1 N. D. 35, 44 N. W. 1003, the defendant, in said territory, on April 24, 1889, prior to the admission of the state into the Union, was convicted of the crime of murder. The Supreme Court of the state reversed the case on account of an instruction given the jury by the trial territorial court, and ordered a new trial.

South Dakota: Section 1, article 26, Schedule, Const. 1889:

"That no inconvenience may arise from the change of the territorial government to the permanent state government, it is hereby declared that all writs, actions, prosecutions, claims, and rights of individuals, and all bodies corporate, shall continue as if no change had taken place in this government; and all process which may be before the organization of the judicial department under this Constitution issued under the authority of the territory of Dakota, within the boundary of this state, shall be as valid as if issued in the name of the state of South Dakota."

In the case of *State v. Leehman,* 2 S. D. 174, 49 N. W. 3, the defendant, in the territory of Dakota, was charged with, on the 11th day of July, 1889, having killed one James H. Burns, and under the state government, after the admission of the state into the Union, was convicted for the crime of murder growing out of said transaction.

Washington: Section 1 (article 27), Schedule, Const. 1889:

"No existing rights, actions, suits, proceedings, contracts or claims shall be affected by a change in the form of government,

but all shall continue as if no change had taken place; and all process which may have been issued under the authority of the territory of Washington previous to its admission into the Union shall be as valid as if issued in the name of the state."

In the case of *Foster v. Territory of Washington*, 1 Wash. 412, 25 Pac. 459, the accused, by indictment, was charged with the crime of permitting faro to be dealt on his premises, committed about the 12th day of January, 1889, in the county of King in said territory. Prior to the admission of the state into the Union, trial was had on said indictment and said defendant convicted. At the December term, 1890, the Supreme Court of the state affirmed the judgment of the lower court.

In the case of *Freidrich v. Territory of Washington*, 2 Wash. 360, 26 Pac. 976, the accused by indictment, was charged with the crime of murder in the first degree, said crime alleged to have been committed on the 14th day of July, 1887, and thereafter, but prior to the admission of said state into the Union, said accused was tried and a judgment of conviction had. On account of certain exceptions reserved to the instructions of the court to the jury, the Supreme Court reversed said cause and remanded it for a new trial.

In the case of *State of Washington v. Stowe*, 3 Wash. 206, 28 Pac. 337, 14 L. R. A. 609, the accused was charged by information with having, on the 5th day of October, 1889, murdered one Enoch Crosby in the city of Tacoma, and after said state was admitted into the Union said accused was tried on said information, which after the admission of the state into the Union had been filed against him, and which was in due form of law, for the murder of said Crosby. Said accused was convicted and sentenced on said conviction. On account of exceptions reserved to the admission of testimony, said cause was reversed by the Supreme Court of the state.

In the case of *Lybarger v. State*, 2 Wash. 553, 27 Pac. 449, 1029, the accused was charged by information, filed by the state's attorney on the 22d day of July, 1890, after admission of the state into the Union, with a justice of the peace of said state, charging

said accused with the crime of seduction; and thereafter, on the 6th day of October, 1890, the said prosecuting attorney for Thurston county made and filed with the superior court of Thurston county an information charging said accused with having on the 10th day of January, 1889, committed the crime of seduction. The accused contended that the law changing the mode of procedure from an indictment to an information was an *ex post facto* law and violated his substantial rights. The Supreme Court of the state, at its July term, 1891, affirmed the judgment of the lower court.

In the case of *State v. Freidrich,* 4 Wash. 206, 29, Pac. 1055, 30 Pac. 328, 31 Pac. 332, which had been before the Supreme Court of said state before (2 Wash. 358, 26 Pac 976), the grand jury of King county, after the admission of the state into the Union, returned a new indictment against the said accused charging him with the crime of murder. On the 12th day of September, 1891, appellant was arraigned upon an indictment, and without any other plea or objection entered his plea of not guilty, and the cause was set for trial on September 21st. On September 16th counsel for appellant filed in the cause a lengthy document, objecting to the validity of said indictment, said crime having been committed prior to the admission of said state into the Union. Said accused was convicted, and sentence pronounced thereon. The following is the conclusion of the Supreme Court of said state:

"The conclusion of the court is that the judgment of death rendered in the superior court be set aside and vacated, but that the verdict of the jury stand, and that the cause be remanded to the superior court of King county, with instructions to enter a new judgment of murder in the second degree against the appellant, and proceed thereon in accordance with the law."

*In re Freidrich,* 149 U. S. 71, 13 Sup. Ct. 793, 37 L. Ed. 653, this record of conviction was taken before the Supreme Court of the United States, and said court refused to discharge him.

In the case of *Way v. Woolery,* 6 Wash. 158, 32 Pac. 1082, this case arose upon a writ of *habeas corpus* issued by one of the

judges of the superior court of King county to examine into the authority of the sheriff to hold the appellant further under his commitment. The contention of the appellant is that, inasmuch as there was nothing in either the enabling act which authorized the organization of the state of Washington, or in the constitution of the state, which in express language authorized this court to remand cases to the superior courts of the state for further proceedings, the superior court had no jurisdiction in this instance, but that if any commitment could be issued by any court it must have been issued by this court. The court said:

"We shall not enter upon any review or discussion of the several portions of the enabling act and the Constitution which operated to transfer causes pending in the Supreme Court of the territory of Washington to the Supreme Court of the state of Washington. They are clear and unmistakable in their language, and the appellant makes no contention that they did not have the effect to give this court jurisdiction to try and determine the former case. The mistake which appellant makes in this matter is found, we think, in that he overlooks the fact that, when this court came into existence and took possession of cases pending in the territorial Supreme Court, it also acquired all the powers of the former territorial court under the statutes of the territory, one of which was to remand cases to the successors of the former territorial district courts, namely, the superior courts, for the execution of its judgments. Therefore, no express language was necessary, either in the enabling act or in the Constitution, to effect that object."

Idaho: Section 1, Schedule, Const. 1889:

"That no inconvenience may arise from a change of the territorial government to a permanent state government, it is declared that all rights, actions, prosecutions, claims, liabilities, and obligations against the territory of Idaho, of whatsoever nature, and rights of individuals, and of bodies corporate, shall continue as if no change had taken place in this government, and all process which may, before the organization of the judicial department under this Constitution, be issued under the authority of the territory of Idaho, shall be as valid as if issued in the name of the state."

In the case of *Territory v. Stover,* 3 Hasb. (Idaho) 35, 26 Pac. 166, the defendant was indicted and convicted prior to the

admission of the state into the Union. The Supreme Court of the state affirmed the judgment of the lower court.

Wyoming: Section 1 (article 21), Schedule, Const. 1889:

"That no inconvenience may arise from a change of the territorial government to a permanent state government, it is declared that all writs, actions, prosecutions, claims, liabilities and obligations against the territory of Wyoming, of whatever nature, and rights of individuals and of bodies corporate, shall continue as if no change had taken place in this government, and all process which may, before the organization of the judicial department under this Constitution, be issued under authority of the territory of Wyoming, shall be as valid as if issued in the name of the state."

Utah: Section 1, Schedule, Const. 1895.:

"In order that no inconvenience may arise, by reason of the change from a territorial to a state government, it is hereby declared that all writs, actions, prosecutions, judgments, claims, and contracts, as well of individuals as of bodies corporate, both public and private shall continue as if no change had taken place; and all process which may issue, under the authority of the territory of Utah, previous to its admission into the Union, shall be as valid as if issued in the name of the state of Utah."

In the case of *People v. Kessler,* 13 Utah, 69, 44 Pac. 97, the defendant was indicted in the district court of the territory of Utah on the 1st day of December, 1894, and under said indictment on the 19th day of December he was found guilty of murder in the second degree, and on the 2d day of May, 1895, he was sentenced on said verdict; and said cause, after the admission of the state into the Union, was reversed by the Supreme Court at its January term, 1896, on account of errors in the admission of testimony and instructions to the jury, no question being raised as to jurisdiction of the Supreme Court of the state to pass on said cause.

In the case of *State of Utah v. Hayes,* 14 Utah, 119, the defendant, by indictment, was charged with the crime of murder in the first degree in shooting and killing one Albert Enstrom, alias Albert Hayes, of Utah county, February 16, 1895. The verdict of guilty of murder in the first degree was rendered April 21, 1896, and the defendant was sentenced to be hanged by the neck until he

was dead, this being a case where the crime was committed and the indictment found prior to the admission of the territory into the Union. The judgment of the lower court sentencing the defendant to be executed was affirmed.

In the case of *People v. Burtleson,* 14 Utah, 259, 47 Pac. 87, the defendant was convicted in the first district court of Utah, prior to the admission of the state into the Union, for the crime of maintaining a nuisance, and the Supreme Court of the state at its October term, 1896, affirmed the conviction.

In the case of *People v. McCune,* 14 Utah, 153, 46 Pac. 658 35 L. R. A. 396, where the defendant was convicted in the Sixth judicial district court of the territory of Utah for befouling a stream, he appealed from said judgment to the Supreme Court of the state, which court at its October term, 1896, affirmed the same.

In the case of *State v. Carrington,* 15 Utah, 483, 50 Pac. 526, the defendant was indicted and convicted of murder in the second degree. The counsel for the prisoner objected to the indictment because it was found by a grand jury of seven members, as provided in section 13, art. 1, Const. of Utah, and claimed that the law authorizing such a jury was *ex post facto* as to this case, because the alleged offense was committed before the Constitution went into effect, and also moved for a change of venue. The court held that it had jurisdiction of said case. The court said: "Nor can we say that the court erred in refusing to grant the motion for a change of venue, under the circumstances disclosed by the record, there being no question as to the jurisdiction of the court to try the cause." The case was reversed and remanded on account of the admission of certain testimony.

In the case of *State v. Thompson,* 15 Utah, 489, 50 Pac. 409, the defendant was indicted for the crime of larceny in May, 1895, tried in Emery county, 1897, before a jury consisting of eight persons, found guilty, and sentenced to imprisonment in the penitentiary. When called upon for sentence his counsel moved to vacate and set aside the verdict, on the ground that the defend-

ant had been tried before eight jurors, when the law in force at the time of the alleged commission of the offense provided that the defendant should be tried by twelve jurors; that the alleged conviction was in violation of the provisions of the Constitution of the United States guaranteeing due process of law; and that the Constitution and laws of Utah providing for trials in criminal cases, not capital, by a jury of eight persons, were as to the offense committed prior to the admission of the state into the Union as a state, in violation of section 10, art. 1, of the Constitution of the United States. The motion was overruled, and the defendant appealed to the Supreme Court of the state, and the judgment of the lower court was affirmed. This case was then taken on a writ of error to the Supreme Court of the United States. In the case of *Thompson v. State of Utah*, 170 U. S. 344, 18 Sup. Ct. 620, 42 L. Ed. 1063, Justice Harlan speaking for the court, said:

"By an indictment returned in the district court of the Second judicial district in the territory of Utah, at its May term, 1895—that being a court of general jurisdiction—the plaintiff in error and one Jack Moore were charged with the crime of grand larceny alleged to have been committed March 2, 1895, in Wayne county of that territory, by unlawfully and feloniously stealing, taking, and driving away one calf, the property of Heber Wilson. The case was first tried when Utah was a territory, and by a jury composed of twelve persons. Both of the defendants were found guilty as charged, and were recommended to the mercy of the court. A new trial having been granted, the case was removed for trial to another county. But it was not again tried until after the admission of Utah into the Union as a state. At the second trial the defendant was found guilty. He moved for a new trial upon the ground, among others, that the jury that tried him was composed of only eight jurors; whereas, by the law in force at the time of the commission of the alleged offense, a lawful jury in his case could not be composed of less than twelve jurors. The application for a new trial having been overruled, the accused having been called for sentence, he renewed his objection to the composition of the jury, and moved by counsel that the verdict be set aside and another trial ordered. This objection was overruled, the accused duly excepting to the action of the court. He was then sentenced to the state prison for a term of three years.

The judgment of conviction was confirmed by the Supreme Court of Utah, the court holding that the trial of the accused by a jury composed of eight persons was consistent with the Constitution of the United States. By the statutes of the territory of Utah in force at the time of the commission of the alleged offense, it was provided that a trial jury in the district court should consist of twelve, and in justice's court of six, persons, unless the parties to the action or proceeding, in other than criminal cases, agreed upon a less number. * * * "

The Supreme Court of the United States further said:

"In our opinion the provision in the Constitution of Utah, providing for the trial in courts of general jurisdiction of criminal cases, not capital, by a jury composed of eight persons, is *ex post facto* in its application to felonies committed before the territory became a state, because in respect of such crimes the constitution of the United States gave the accused, at the time of the commission of his offense, the right to be tried by a jury of twelve persons, and made it impossible to deprive him of his liberty except by the unanimous verdict of such a jury."

In the case of *State v. Bates,* 14 Utah 296, 47 Pac. 78, 43 L. R. A. 33, the defendant was tried upon an indictment charging him with the murder of John Nordquist, the crime having been committed prior to the admission of the state into the Union. The defendant was convicted and sentenced to imprisonment for 10 years. The judgment of the lower court was affirmed.

District of Columbia: When Virginia in 1789 ceded a portion of said territory to the United States government, it provided that jurisdiction of the laws of said commonwealth over individuals residing within the limits of such cession should not cease or determine until Congress, having accepted the cession, should by law provide for the government thereof. Congress (Act July 16, 1790, c. 28, 1 Stat. 130, Act March 3, 1791, c. 17, 1 Stat. 214) adopted such cession, and provided that the operation of the laws of the state within such district should not be affected until Congress should otherwise provide by law. In the case of *United States v. Heinegan,* 1 Cranch (C. C.) 50, 26 Fed. Cas. 253, No. 15,340, an offense committed prior to the consummation of said cession in such territory, against the commonwealth of Virginia,

was prosecuted in the United States Circuit Court of the District of Columbia, as an offense against the United States, to final judgment.

There are unquestionably many other state cases of like import, but these are sufficient to show the settled policy of the Congress from 1792, when Kentucky was admitted, until 1896, when Utah joined the Union of states; one unbroken line, acquiesced in without even a protest.

In the case of Florida there is no provision in the Constitution (1838) under which it was admitted for the transfer of cases not of federal nature from the state courts that expressly became the successors of the superior courts of the territory to the federal courts following after statehood. Had thtere been such, it would have unquestionably been held in *Re Benner v. Porter,* 9 How. (U. S.) 235, 13 L. Ed. 119, that when Congress admitted the said state under said Constitution it thereby expressly concurred in such provision. See, also, *Calkin v. Cocke,* 14 How 237, 14 L. Ed. 398.

It is obvious that it has been the universal practice in this re·public to prosecute pending criminal cases, not of a federal nature, in the state courts, as the successors of the territorial courts when new states were admitted into the Union where it was so provided in their respective Constitutions. It has remained until the forty-sixth state was admitted before this power was ever questioned in any forum.

It is seriously contended for the first time, so far as we can find, that it is not within the power of Congress to provide that criminal cases, not of federal nature, cognizable before the territorial courts, shall be tried by the state courts as successors of the same, and even though the state concurs in such provision.

In the case of *American &Ocean Insurance Company v.* 350 *Bales of Cotton,* 1 Pet. (U. S.) 511, 7 L. Ed. 255, Chief Justice Marshall, for the court says:

"On the 2d day of February, 1819, Spain ceded Florida to the United States. The sixth article of the treaty of cession contains the following provision: 'The inhabitants of the territories.

which his Catholic Majesty cedes to the United States by this
treaty, shall be incorporated into the Union of the United States
as soon as may be consistent with the principles of the federal
Constitution, and admitted to the enjoyment of the privileges,
rights and immunities of the citizens of the United States.' This
treaty is the law of the land, and admits the inhabitants of Flor-
ida to the enjoyments of the privileges, rights, and immunities of
the citizens of the United States. It is unnecessary to inquire
whether this is not their condition independent of stipulation.
They do not, however, participate in the political power; they do
not share in the government till Florida shall become a state. In
the meantime Florida continues to be a territory of the United
States; governed by virtue of that clause in the Constitution
which empowers congress 'to make all needful rules and regula-
tions, respecting the territory, or other property belonging to the
United States.' Perhaps the power of governing a territory be-
longing to the United States, which has not by becoming a state,
acquired the means of self government, may result necessarily
from the facts that it is not within the jurisdiction of any particu-
lar state, and is within the power and jurisdiction of the United
States. The right to govern may be the inevitable consequence of
the right to acquire territory. Which ever may be the source
whence the power is derived, the possession of it is unquestioned.
*   *   *

"It has already been stated that all the laws which were in
force in Florida while a province of Spain, those excepted which
were political in their character, which concerned the relations
between the people and their sovereign, remained in force until
altered by the government of the United States. Congress recog-
nizes this principal by using these words, 'laws of the territories
now in force therein.' No laws could have been in force but those
enacted by the Spanish government. If, among these, a law ex-
isted on salvage—and it is scarcely possible there should not have
been such a law—jurisdiction over cases arising under it was con-
ferred on the superior courts; but that jurisdiction was not exclus-
ive. A territorial act, conferring jurisdiction over the same cases
on an inferior court, would not have been inconsistent with this
section.   *   *   *

"If we have recourse to that pure fountain from which all
the jurisdiction of the federal courts is derived, we find language
employed which can not well be misunderstood. The Constitution
declares (article 3), that 'the judicial power shall extend to all

cases in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be under their authority; to all cases affecting ambassadors, or other public ministers, and consuls, and to all cases of admiralty and maritime jurisdiction.' * * *

"It has been contended that by the Constitution the judicial power of the United States extends to all cases of admiralty and maritime jurisdiction, and that the whole of this judicial power must be vested 'in one Supreme Court, and in such inferior courts as Congress may from time to time ordain and establish.' Hence it has been argued that Congress can not vest admiralty jurisdiction in courts created by the territorial Legislature. We have only to pursue this subject one step further to perceive that this provision of the Constitution does not apply to it. The next sentence declares 'that judges both of the supreme and inferior courts, shall hold their office during good behavior.' The judges of the superior courts of Florida hold their offices for four years. These courts, then, are not constitutional courts, in which the judicial power conferred by the Constitution on the general government can be deposited. They are incapable of receiving it. They are legislative courts created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations respecting the territory belonging to the United States. The jurisdiction with which they are invested is not a part of that judicial power which is defined in the third article of the Constitution, but is conferred by Congress, in the execution of those general powers which that body possess over the territories of the United States. Although admiralty jurisdiction can be exercised in the states in those courts only which are established in pursuance of the third article of the Constitution, the same limitation does not extend to the territories. In legislating for them, Congress exercises the *combined powers of the general and of a state government.*"

In the case of *McAlester v. United States,* 141 U. S. 177, 11 Sup. Ct. 949, 35 L. Ed. 695, it is said:

"In view of these and other provisions of that act, it is clear that the District Court for Alaska was invested with the powers of a District Court and a Circuit Court of the United States, as well as with general jurisdiction to enforce in Alaska the laws of the state of Oregon, so far as they were applicable and not inconsistent with the act and the Constitution and laws of the

United States. But is the court thus established for Alaska one of the 'courts of the United States' within the meaning of section 1768 of the Revised Statutes? If it be, then the President had no authority, by that section, to suspend Judge McAlester, and his claim to salary, up to, at least, the confirmation by the Senate of the nomination of Dawson is well founded. If it be not, then the judge of the Alaska court is not of the class excepted by that section, and being a civil officer, appointed by and with the advise and consent of the Senate, was within the very terms of the clause authorizing his suspension by the President during the recess of the Senate. An affirmative answer to the question just stated could not well be given upon the theory that a territorial court is one of those mentioned in article 3 of the Constitution, declaring that the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as Congress may from time to time establish, the judges of which hold their office during good behavior, receiving at stated times, for their services, a compensation that can not be diminished during their continuance in office, and are removable only by impeachment."

In the case of *Benner v. Porter,* 9 How. (U. S.) 235, 13 L. Ed. 119, the court says: That territories "are legislative governments, and their courts, *legislative* courts, Congress in the exercise of its powers in the organization and government of the territories, *combining the powers of both the federal and state authorities."* The court further says:

"The territorial courts, therefore, were not courts upon which the judicial power conferred by the Constitution (article 3, § 1) on the federal government could be deposited. They were incapable of receiving, as the tenure of the incumbent was for but four years. *American Ins. Co. v. Canter,* 1 Pet. (U. S.) 546, 7 L. Ed. 256. Neither were they organized by Congress under the Constitution, as they were invested with powers and jurisdiction which that body were incapable of conferring upon a court within the limits of the state."

In the case of *Clinton v. Englebrecht,* 13 Wall. (U. S.) 434, 20 L. Ed. 659, Chief Justice Chase said:

"The Judges of the Supreme Court of the territory are appointed by the President under the act of Congress, but this does not make the courts they are authorized to hold courts of the

United States. This was decided long since in *American Ins. Co. v.* 356 *Bales of Cotton,* 1 *Pet.* (U. S.) 546, 7 L. Ed. 256: *Benner v. Porter,* 9 How,' (U. S.) 255, 13 L. Ed. 119. There is nothing in the Constitution which would prevent Congress conferring the jurisdiction which they exercise, if the judges were elected by the people of the territory and commissioned by the Governor. They might be clothed with the same authority to decide all cases arising under the Constitution and laws of the United States, subject to the same revision. Indeed, it hardly can be supposed that the earliest territorial courts did not decide such questions, although there was no express provision to that effect, as we have already seen, until a comparatively recent period. There is no Supreme Court of the United States, nor is there any District Court of the United States, in the sense of the Constitution, in the territory of Utah. The judges are not appointed for the same terms, nor is the jurisdiction which they exercise part of the judicial power conferred by the Constitution of the general government. The courts are the· legislative courts of the territory, created in virtue of the clause which authorizes Congress to make all needful rules and regulations respecting the territories belonging to the United States."

In the case of *Hornbuckle v. Toombs,* 85 U. S. 648, 21 L. Ed. 966, Justice Bradley says:

"That acts of Congress respecting proceedings in United States courts are concerned with and confined to those courts, considered as parts of the federal system, and as invested with the judicial power of the United States expressly conferred by the Constitution, and to be exercised in correlation with the presence and jurisdiction of the several state courts and governments. They were not intended as exertions of that plenary municipal authority which ·Congress has over District of Columbia and the territories of the United States."

In the case of *Snow v. United States,* 18 Wall. (U. S.) 319, 21 L. Ed. 784, which involved the question as to whether the United States attorney or the proper territorial attorney should prosecute certain cases in the territory of Utah, the court said:

"Strictly speaking, there is no sovereignty in a territory of the United States but that of the United States itself. Crimes committed therein are committed against the government and dignity of the United States. It would seem that the indictments and writs should regularly be in the name of the United States,

and that the attorney of the United States was the proper officer
to prosecute all offenses.  But the practice has been otherwise,
not only in Utah, but in other territories organized   upon   the
same type."

In the case of *National Bank v. County of Yankton,* 101 U.
S. 162, 168 (25 L. Ed. 1046), the court said:

"All territory within the jurisdiction of the United States
not included in any state must necessarly be governed by or under
the authority of Congress.  The territories are but political sub-
divisions of the outlying dominion of the United States.   Their
relation to the general government is much the same as that which
counties bear to the respective states, and Congress may legislate
for them as a state does for its municipal organizations.  The or-
ganic law of a territory takes the place of a Constitution as the
fundamental law of the local government.  It is obligatory on
and binds the territorial authorities; but Congress is supreme, and
for the purposes of this department of its governmental authority
has all the powers of the people of the United States, except
such as were expressly or by implication reserved in the prohibi-
tions of the Constitution.  In the organic act of Dakota there
was not an express reservation of power in Congress to amend
the acts of the territorial Legislature, nor was it necessary.  Such
a power is an incident of sovereignty, and continues until granted
away. Congress may not only abrogate laws of the territorial Leg-
islature, but it may itself legislate directly for the local govern-
ment.  It may make a void act of the territorial Legislature valid,
and a valid act void.  In other words, it has full and complete
legislative authority over the people of the territories and all the
departments of the territorial governments."

To the same effect is the case of *Shively v. Bowlby,* 152 U. S.
1, 48, 14 Sup. Ct. 548, 38 L. Ed. 331, which was brought to the
Supreme Court of the United States on a writ of error to the Su-
preme Court of the state of Oregon.  Mr. Justice Gray, in deliver-
ing the opinion of the court, said:

"By the Constitution, as is now well settled, the United States,
having rightly acquired the territories, and being the only gov-
ernment which can impose laws upon them, have the entire do-
minion and sovereignty national and municipal, federal and state,
over all the territories, so long as they remain in the territorial
condition.  *American Ins. Co. v. Canter,* 1 Pet. (U. S.) 511

542, 7 L. Ed. 242; *Benner v. Porter,* 9 How. (U. S.) 242, 255, 13 L. Ed. 119; *Cross v. Harrison,* 16 How. (U. S.) 164, 193 (14 L. Ed. 889); *National Bank v. Yankton County,* 101 U. S. 129, 133 (25 L. Ed. 1046); *Murphy v. Ramsey,* 114 U. S. 15, 44, 5 Sup. Ct. 747, 29 L. Ed. 47; *Mormon Church v. United States,* 136 U. S. 1, 42, 43, 10 Sup. Ct. 792, 34 L. Ed. 481; *McAlester v. United States,* 141 U. S. 174, 181, 11 Sup. Ct. 949, 35 L. Ed. 693."

"Congress has absolute power over the territories, and may legislate directly for the government thereof. It is within the powers of Congress to declare crimes. and punishments therefor in the territories." (*National Bank v. Yankton,* 101 U. S. 129, 25 L. Ed. 1046; *Reynolds v. United States,* 98 U. S. 145, 25 L. Ed. 244.)

· "In the territories Congress has the entire dominion and sovereignty, national and local, federal and state, and has full legislative power over all subjects upon which the Legislature of a state might legislate in a state." (*Metropolitan Railroad Co. v. District of Columbia,* 132 U. S. 9, 10 Sup. Ct. 19, 33 L. Ed. 231; *Simms v. Simms,* 175 U. S. 168, 20 Sup. Ct. 58, 44 L. Ed. 115; *U. S. v. McMillan,* 165 U. S. 510, 17 Sup. Ct. 395, 41 L. Ed. 805.)

"Congress may govern the territories either mediately or immediately, either by the creation of a territorial government with power to legislate for the territory, subject to such restrictions and restraints as Congress may impose upon it, or by the passage of laws directly. operating upon the territory without the intervention of a subordinate government." (*De Lima v. Bidwell,* 128 U. S. 1, 21 Sup. Ct. 743, 45 L. Ed. 1041; *Downes v. Bidwell,* 182 U. S. 244, 45 L. Ed. 1088; *Dorr v. U. S.,* 195 U. S. 138, 24 Sup. Ct. 808, 49 L. Ed. 128.)

Congress exercises the combined powers of the national and state governments, and in which such powers of Congress are absolute, complete and supreme. *American Ins. Co. v. Canter,* 1 Pet. (U. S.) 511-542, 7 L. Ed. 242; *Case v. Toftus* (C. C.) 39 Fed. 733, 5 L. R. A. 684; *Territory v. Lee,* 2 Mont. 130; *Murphy v. Ramsey,* 114 U. S. 15, 5 Sup. Ct. 747, 29 L. Ed. 47; *Thompson v. Utah,* 170 U. S. 374, 18 Sup. Ct. 620, 42 L. Ed. 1061; *White v. Berry,* 171 U. S. 366, 18 Sup. Ct. 917, 43 L. Ed. 199; *United States v. Coe,* 155 U. S. 85, 15 Sup. Ct. 16, 39 L. Ed. 76; *Hunt v. Palo,* 4 How. (U. S.) 589, 11 L. Ed. 1115; *Webster v. Reid,* 11

How. (U. S.) 437, 13 L. Ed. 761; *Freeborn v. Smith,* 2 Wall. (U. S.) 160, 17 L. Ed. 922; *Express Co. v. Kountze,* 8 Wall. (U. S.) 349, 19 L. Ed. 457; *In re Wilson,* 140 U. S. 575, 11 Sup. Ct. 870, 35 L. Ed. 513.

By an act of Congress of Mar. 2, 1890, the Attorney General of the United States was directed to institute a suit in equity in the Supreme Court of the United States against the state of Texas, setting forth the title and claim of the United States to a certain tract of land designated on the map of Texas as Greer county. Suit was thereafter instituted in the Supreme Court by the Attorney General of the United States, in accordance with the provisions of this act, to determine such question. The case was decided on March 16, 1896 (*United States v. Texas,* 162 U. S. 1, 16 Sup. Ct. 725, 40 L. Ed. 867), the court holding that Greer county, Tex., was not within the limits or under the jurisdiction of that state, but subject to the exclusive jurisdiction of the United States of America. Section 2 of an act of Congress relating to Greer county (Act May 4, 1896, c. 155, 29 Stat. 114), provides:

"That all proceedings and actions of every kind, in or before the several courts and officers of Greer county, Texas, shall have the same force and effect as if said courts and officers had been legally authorized courts and officers of the United States or of the territory of Oklahoma, and the courts of said territory having jurisdiction of similar matters shall make and issue all orders and writs necessary to enforce the orders, decrees, and final judgments of said courts and officers of Texas."

Section 3 provides:

"That all suits which are pending in the several courts of said Greer county, Texas, on March sixteenth, eighteen hundred and ninety-six, as shown by the dockets thereof, shall be entered upon the dockets of the courts of Oklahoma having jurisdiction of like cases, and the same shall proceed as if they had been brought in said courts of Oklahoma. Where an appeal or writ of error has been taken by any of said courts of Greer county, Texas, to any other court of Texas, the judgment of said appellate court shall be binding upon all parties to such case, and upon the filing of a certified copy thereof in the court of Oklahoma having juris-

diction of like cases, it shall be the duty of such court to enter the same upon its minutes and proceed in said action in all respects as though it had rendered the original judgment therein. All rights in the cases mentioned in this section shall be determined by the law of Texas applicable to the act or transaction involved, and the court shall take judicial notice of such law for the purpose. When any judgment affirmed by any such appellate court provides for imprisonment, such imprisonment shall be in such place as the proper court of Oklahoma shall designate."

It will be observed in that act Congress provided that all cases which were pending in the several courts of Greer county, Tex., should be entered upon the dockets of the courts of Oklahoma having jurisdiction of like cases, and that the same should be proceeded with as if they had been brought in said courts of Oklahoma. All criminal proceedings pending in Greer county, Tex., had been instituted by the state of Texas and were pending in the courts of that state, and in all other respects were proceedings which had been instituted under the laws of. Texas. Congress transfered those cases to the territory of Oklahoma to be prosecuted by the proper county officers of Greer county, Okla., a territory of the United States. Strictly speaking, Greer county was never a part of the state of Texas, but it certainly cannot be a question that the state of Texas, with a *de jure* government. maintained a *de facto* government in Greer county. Its courts were constituted in the same manner provided by the laws of the state of Texas, and authorized by legislative enactments. The control of Texas in domestic and local affairs was supreme and undisturbed. It had every attribute, and performed every function, of a *de jure* government. Up to the time of the decisions of the Supreme Court of the United States, the state of Texas, a *de jure* government, exercised an undisturbed sovereignty and jurisdiction over Greer county, and while this power was exercised without right, it constituted a *de facto* government, executive, legislative, and judicial, and all the acts of its officers and courts, not in contravention of any rights under the laws of the Constitution of the United States, were valid and binding. The act of Congress transferred all cases instituted and pending under the laws and

in the courts of one sovereignty to the courts of another sovereignty, to be there proceeded with as if they had been brought originally in the courts of the soveriegnty to which they were transferred. In that case there was an exercise of sovereignty by one of the states of the Union over territory which did not belong to it, and while the governments and courts in Greer county, Tex., were merely *de facto* and not *de jure,* at the same time could it be said that the transfer of the criminal cases which had been previously instituted and which were pending in the courts of Texas was not a transfer of cases from one sovereignty to another?

The only case which has drawn in question the validity of the act of Congress was that of *Cullins et al. v. Overton, Sheriff, et al.,* 7 Okla. 470, 54 Pac. 702 ,in which it was held that the act was in all respects within its constitutional powers.

There can be no doubt as to the power of Congress to make such provisions in respect to criminal cases, although of a local character and not of a federal nature, unless the defendant is entitled by some provision of the federal Constitution to have his case prosecuted to a final determination in the United States court in that territory. As between the territory of Oklahoma and the Indian Territory there is one difference: In Oklahoma Congress had created the territorial government as an agency through which the power of Congress with respect to the prosecution of offenses of a local character was exercised. Congress in the Indian Territory, exercised its paramount power of legislation directly instead of indirectly. There has not been a uniformity in the government and control of the territories by the Congress of the United States. The following are examples:

Arkansas: Under an act of Congress approved March 2, 1819, c. 49, 3 Stat. 493, Arkansas was organized into a territorial form of government, and section 5 of said act reads as follows:

"That, the legislature shall, until the organization of the General Assembly hereinafter provided for, be vested in the Governor and judges of the superior courts of the territory. who shall have power to pass any law for the administration of

justice in said territory which shall not be repugnant to this act or inconsistent with the Constitution of the United States: Provided, whenever the general assembly shall be organized all the legislative powers shall be vested in and exercised by said General Assembly."

California: The state of California was brought within the limits of the United States by the treaty of Guadalupe Hidalgo. concluded February 22, 1848, and proclaimed July 4, 1848. It was governed by the commanding officer of the military force stationed there acting as provisional governor. There was never any organized form of territorial government. General Riley, U. S. A., the provisional governor, without any action on the part of Congress, called a convention which framed a Constitution and submitted the same to the people for ratification, and on November 13, 1849, same was ratified, and afterwards, to wit, on September 9, 1850, Congress passed an act for the admission of California into the Union. On September 28, 1850, a subsequent act of Congress provides that all laws of the United States, which were not locally inapplicable, should have the same force and effect within the state of California as elsewhere in the United States.

Florida: An act of Congress, approved March 30, 1822, c. 13, 3 Stat. 654. organized Florida into a territorial form of government. Section 5 of said act provides that the legislative power shall be vested in a governor and in thirteen of the most fit and discreet persons of the territory, to be called the "Legislative Council" who shall be appointed annually by the President of the United States, by and with the advice and consent of the Senate, from among the citizens of the United States residing there. The Governor, by and with the advice and consent of said Legislative Council, or a majority of them, shall have power to alter, modify, or repeal the laws which may be in force at the commencement of this act. Their legislative powers shall also extend to all rightful subjects of legislation, but no law shall be valid which is inconsistent with the Constitution and laws of the United States, or which shall lay any person under restraint, burthen or

disability on account of his religious principals, all of which he shall be free to maintain not burdened with those of another.

Louisiana: On March 3, 1805, Congress passed an act organizing Louisiana into a territorial form of government (chapter 31, 2 Stat. 331). Section 3 of said act provides that the legislative power shall be vested in a Governor and in three judges, or a majority of them, who shall have power to establish inferior courts in the said territory and prescribe their jurisdiction, and to make all laws which they deem conducive to the good government of the inhabitants thereof: Provided, however, that no law shall be valid which is inconsistent with the Constitution and laws of the United States, or which shall lay any person under restraint or disability on account of his religious opinions, profession, or worship, in all of which he shall be free to maintain his own and not be burdened with those of another: And provided also, that in all criminal prosecutions the trial shall be by a jury of twelve good and lawful men, and in all civil cases of the value of $100, the trial shall be by jury if either of the parties require it.

Missouri: By act of Congress of June 4, 1812, c, 95, 2 Stat. 743, Missouri was organized into a territorial government, and section 4 of said act provides that the legislative power should be vested in a General Assembly, which should consist of the Governor, the Legislative Council, the House of Representatives; and section 5 further provides that the Legislative Council should consist of nine members, to continue in office five years, unless sooner removed by the President of the United States, and five of them should be a quorum. The Legislative Council should be nominated and appointed in the manner following: As soon as representatives should be elected they should be confirmed by the Governor, and when said Legislative Assembly meets they should nominate 18 persons, residents in said territory, one year preceding their nomination, holding no office of profit under the territory or of the United States, the office of justice of the peace excepted, and each possessing in his own right 200 acres of land therein, and return the names to the President of the United

States, nine of whom the President, by and with the advice and consent of the Senate, should appoint and commission to serve as aforesaid, and when a vacancy should occur in the Legislative Council by death or removal from office, the House of Representatives should nominate two persons qualified as aforesaid, and return their names to the President of the United States, one of whom he should, by and with the advice and consent of the Senate, appoint and commission for the residue, of the term and every five years thereafter in like manner the President should appoint the successors or members of said council.

In the Constitutions of the states under which said territories were admitted into the Union were contained provisions for the continuance of all prosecutions. Unless it was so clear and evident as to reach a moral certainty that Congress did not have the power expressly or by reasonable implication, after a century of acquiescence in same, when new states were admitted into the Union, to provide for the state to assume jurisdiction of cases of a local nature arising under the territorial government, this court will not at this late date declare such provisions to be void. But what provision in the federal Constitution gives the defendant the right to demand to be tried in a federal tribunal for an offense committed under the territorial form of government, after it has ceased to exist? We have been cited to none.

The sixth amendment to the federal Constitution is as follows:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the *state* and *district* wherein the crime shall have been committed, which district shall have *previously been ascertained* by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor and to have the assistance of counsel for his defense."

The only clause in this provision which might be made the subject of argument on the constitutional question is the clause, "which district shall * * * have been previously ascertained

by law," and under the decision of the Supreme Court of the United States this provision would not be applicable in a case such as we have under consideration. The Supreme Court has held repeatedly that the sixth amendment applies only to the case of offenses against the laws of the United States committed within the limits of a state, and does not apply to those offenses committed within one of the territories of the United States.

In the case of *United States v. Dawson,* 15 How. (U. S.) 467, 14 L. Ed. 775, an indictment had been returned in the Circuit Court of the United States for the district of Arkansas, charging murder in the Indian Territory west of the state of Arkansas. A motion was made on behalf of the defendant to quash the indictment, and one of the points urged by the counsel for the defendant was the jurisdiction of the court in which the case was being tried. The judges being divided in opinion concerning certain questions of law, the case came before the Supreme Court of the United States upon a certificate of division. Mr. Justice Nelson, in delivering the opinion of the court, in referring to the sixth amendment to the Constitution, said:

"It has been supposed that a provision in the sixth amendment to the Constitution of the United States has a bearing upon this question, which provides that 'in all criminal prosecutions the accused shall enjoy the right of a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law.' The argument is that, since the erection of the new district out of the nine western counties in the state together with the Indian country, it is not competent for the circuit court, in view of this amendment, to try the prisoners within the remaining portion of the old district, inasmuch as that amendment requires the district within which the offense is committed and the trial is to be had must be ascertained and fixed previous to the commission of the offense."

In the case of *Jones v. United States,* 137 U. S. 202, 11 Sup. Ct. 80, 34 L. Ed. 691, which was an indictment for murder, the Supreme Court, in refering to the sixth amendment, said:

"By the Constitution of the United States, while a crime committed within any state must be tried in that state and in a

district previously ascertained by law, yet a crime not committed within any state of this Union may be tried at such place as Congress may by law have directcd."

And in the case of *Cook v. United States,* 138 U. S. 157, 11 Sup. Ct. 268, 34 L. Ed. 906, the Supreme Court, in considering this provision of the Constitution, held to the same effect.

It will be observed by the above cases that the sixth amendment does not apply in any case where a proceeding is instituted outside of the jurisdiction of a state for a violation of the laws of the United States. The question is settled by abundant authorities. The power of Congress to designate the place of trial of criminal cases, regardless of the sixth amendment, outside of the jurisdiction of a state, cannot be successfully attacked.

Oklahoma: Section 14, Enabling Act:

"That all prosecutions for crimes or offenses hereafter committed in either of said judicial districts as hereby constituted shall be cognizable with the district in which committed, and all prosecutions for crimes and offenses committed before the passage of this act in which indictments have not yet been found or proceedings instituted shall be cognizable within the judicial district as hereby constituted in which such crimes or offenses were committed." (Act June 16, 1906, c. 3335. 34 Stat. 275.)

In the argument of this case there were quite a contrariety of constructions suggested as to this section, but in view of the sixth amendment to the Constitution, as construed by the Supreme Court of the United States, the intention of Congress was quite evident. Congress provided for the erection of a state out of Oklahoma and Indian Territories, and created two judicial districts. and in providing that crimes that were committed after statehood, of a federal nature, should be cognizable within a previously ascertained district in which the crime was committed, at the same time provided that such cases of a federal nature committed prior to statehood should in like manner be tried.

In the United States courts of an unorganized territory—all being legislative courts created by the same powers—crimes of a local character are practically the same as those committed in an organized territory; for as appears in *Snow v. U. S., supra,* with

strict propriety such crimes are against the peace and dignity of the United States, although the indictment alleges "against the peace and dignity of the people of the territory." If such a case can be prosecuted in a state court as sucessor of such court under the organized territory, why not in like manner as successor of a court of like character under the government of the unorganizea territory? The alleged distinction is certainly of no moment when we are considering the constitutional power of Congress in admitting a new state to provide for proper succession of courts, and as to actions and prosecutions, so as to prevent any interval or hiatus between the old and new systems.

Further, when a territoral government is created, and courts are established by means of legislation through acts of Congress, the United States Congress does not relinquish dominion or sovereignty over such territory, so far as the prosecutions of crimes of a local nature or character are concerned, but an agency is thereby ocreated through which its powers may be exercised. If all crimes committed within a territory are committed against the government and peace and dignity of the United States, as has been said in the case of *Snow v. United States,* 18 Wall. (U. S.) 319, 21 L. Ed. 784, *supra,* what material difference is there, so far as the constitutional power of Congress is concerned, with respect to the transfer of pending cases, whether they are pending in the territorial courts of an organized territory or in the United States courts of an unorganized territory?

Section 16 of the enabling act, as amended March 4, 1907 (chapter 2911, pt. 1, 34 Stat. 1286), so far as it relates to district court cases, is as follows:

"Prosecutions for all crimes offenses committed within the territory of Oklahoma or in the Indian Territory, pending in the district courts of the territory of Oklahoma or in the United States courts in the Indian Territory upon the admission of such territories as a state, which, had they been *committed within a state, would have been cognizable in the federal courts,* shall be transferred to and be proceeded with in the United States Circuit or District Court established by this act for the district in which the

offenses were committed in the same manner and with the same effect as if they had been committed within a state."

The test is to be made by applying the hypothetical existence of a state to a region that was specifically a territory and subject to special laws as such.

Section 39 of the enabling act under which Oklahoma was admitted, but relating solely to Arizona and New Mexico is as follows:

"That in respect to all cases, proceedings, and matters now pending in the supreme court or district courts of the said territories at the time of the admission into the Union of the said state, and arising within the limits of such state, whereof the circuit or district courts by this act established might have had jurisdiction under the laws of the United States had such courts existed at the time of the commencement of such cases, the said circuit and district courts, respectively, shall be the successors of said supreme and district courts of the said territories respectively; and in respect to all cases, proceedings, and matters pending in the supreme or district courts of the said territories at the time of the admission of such territories into the Union, arising within the limits of said state, the courts established by such state shall, respectively be the successors of said supreme and district territorial courts; and all the files, records, indictments and proceedings relating to any such cases shall be transferred to such circuit, district, and state courts, respectively, and the same shall be proceeded with therein in due course of law; but no writ, action, indictment, cause, or proceeding now pending, or that prior to the admission of the state shall be pending, in any territorial court in said territories shall abate by the admission of such state into the Union, but the same shall be transferred and proceeded with in the proper United States circuit, district, or state court, as the case may be: Provided, however, that in all civil actions, causes and proceedings, in which the United States is not a party transfers shall not be made to the Circuit and District Courts of the United States except on cause shown by written request of one of the parties to such action or proceeding filed in the proper court; and in the absence of such request such cases shall be proceeded with in the proper state courts." (Act June 16, 1906, c. 3335, 34 Stat. 284.)

In the case of *Moore v. United States,* 85 Fed. 470, 29 C. C. A. 274, the court says:

"There are some acts which Congress may by law designate as a crime against the general government or against the operations of government which effect every citizen, whether of a state or territory; such as treason, illegally holding office, violations of the postal laws, false impersonation in procuring naturalization, presenting false claims against the government, etc. The federal laws defining these and kindred offenses operate upon all citizens of the United States, and that they reside in a state constitutes no exemption from a prosecution for a violation thereof in the courts of the United States, for jurisdiction is expressly conferred by statute upon the federal courts. As applied to criminal laws, it is the laws of the United States that the enabling act declares shall have the same force and effect within the state of Utah as elsewhere within the United States; and it is prosecutions for violations thereof which, under the provisions of that act, are not to abate upon the admission of the state by reason of any change in the courts, but are to be transferred from the territorial district court, a court having jurisdiction in such cases during the existence of a territorial form of government, to the circuit and district courts, courts having jurisdiction in such cases after admission of the state. That the provisions of the enabling act were so understood and construed by the Constitutional convention is evidenced by the fact that in the schedule (annexed to the Constitution) providing for the transfer of causes to the federal courts it provides only for those cases whereof the United States Circuit Court and District Courts might have had jurisdiction had there been a state government at the time of the commencement thereof, an this is not such a case."

Apparently it was the intention of the Congress in using the language in section 16 of the enabling act, as amended, in reference to pending cases in Oklahoma and Indian Territory, different to that in section 39 of the same act relating to such cases in New Mexico and Arizona, two organized territories, to recognize the existing conditions of an organized and unorganized territory being admitted as one state into the Union. And obviously the Congress intended to vest in the federal courts the continued prosecution of criminal cases of a federal character, and to continue in the state courts the prosecutions of a local or municipal character.

Applying this test to a county embraced within the former Indian Territory, which had never been erected into an organized

territory with a legislative assembly, but where all the governmental legislation therefor was directly enacted by the Congress, it was not intended that pending criminal cases should be transferred to the federal courts merely because they all involved an offense under an act of Congress. For the last clause of section 20, as amended, is as follows:

"All criminal cases pending in the United States courts in the Indian Territory, not transferred to the United States Circuit or District Courts in the state of Oklahoma, shall be prosecuted to final determination in the state courts of Oklahoma under the laws now in force in that territory."

The distinction reasonably appears to be the same as that recognized in reference to organized territories, in which the territorial courts sitting as United States courts have cognizance of laws of the United States, and as territorial courts laws of the territory or of a local nature. *Ex parte Gen-shav-ee*, 130 U. S. 343. 9 Sup. Ct. 542, 32 L. Ed. 973; *United States v. Pridgeon*, 153 U. S. 48, 14 Sup. Ct. 746, 38 L. Ed. 631.

We conclude that prosecutions of offenses which are of such a character that the federal jurisdiction does not depend upon the fact of their having been committed within a territory, but, even should the territory have been erected into a state previous to the commission of the offense, would have still been cognizable in the federal courts, and that such previous prosecutions as were based. upon an enactment relating particularly to Indian Territory or to territories generally are to be considered as laws relating to the local government, and are not to be transferred to the federal courts, but are to be prosecuted to final determination in the state courts as successors of the territorial courts of Oklahoma Territory or of the United States courts of the Indian Territory in their local capacity. Further, however, prosecutions under any federal statute, which were not contingent on the fact that the country was formerly a territory, but established a general law relating to crime against the United States of which a federal court would have had jurisdiction even had the crime been committed within a

state, and not within a territory, are to be transferred to the federal courts.

In the case of *Koenigsberger v. Richmond Silver Mining Company,* 158 U: S. 41, 48, 15 Sup. Ct. 751, 39 L. Ed., 889. which was an action at law commenced in the district court of the First judicial district of the territory of Dakota, the Supreme Court of the United States, in passing upon the question of the admission of a territory as a state and the disposition of pending cases, said:

"So long as a territory of the United States remains in the territoral condition, and the United States have entire dominion and sovereignty over it, national and municipal, there is ordinarily no occasion to distinguish how far the subjects committed by Congress to the courts of the territory are not of a federal character. *American Inc. Co. v. Canter,* 1 Pet.(U. S.) 511, 546, 7 L. Ed. 242; *Benner v. Porter,* 9 How. (U. S.) 235, 242, 243, 13 L. Ed. 119. But when a territory is admitted into the Union as a state, upon the same footing as all the other states, the territorial government and courts cease to exist, and matters of national cognizance remain within the power and jurisdiction of the nation, but other matters come under the power and jurisdiction of the state; and then it becomes important to distinguish, as to pending suits, whether they are of a federal or a municipal character, and to provide by law that those of the first class should proceed in the courts of the United States and those of the second class in the courts of the new state. The courts of the United States inferior to this court having no jurisdiction except as conferred by Congress, congressional legislation is necessary to enable those courts, after the admission of the state into the Union, to take jurisdiction of cases previously commenced in the courts of the territory, and not yet finally adjudged. And such legislation has been so construed and expounded by this court as to give effect, as far as possible, consistently with its terms and with the Constitution of the United States, to the apparent intention of Congress to vest in the courts of the United States the jurisdiction of such cases, so far as they are of a federal character, either because of their arising under the Constitution and laws of the United States, or because of their being between citizens of different states. *Freeborn v. Smith,* 2 Wall. (U. S.) 160, 17 L. Ed. 922; *Express Co. v. Kountze,* 8 Wall. (U. S.) 342, 350, 351, 19 L. Ed. 457; *Baker v. Morton,* 12 Wall. (U. S.) 150, 153, 20 L. Ed. 262. See also, *United States v. Lynde*

*et al.* (C. C.) 44 Fed. 215 and *Bates v. Payson,* 4 Dill. (U. S.) 265, Fed. Cas. No. 1,103."

Section 33 of the act of May 2, 1890, c. 182, 26 Stat. 81, is as follows:

"That the provisions of chapter forty-five of the general laws of Arkansas, entitled 'Criminal Law,' except as to 'the crimes and misdemeanor mentioned in the provisos to this section, and the provisions of chapter forty-six of the said general laws of Arkansas, entitled 'Criminal Procedure,' as far as they are applicable, are hereby extended over and put in force in the Indian Territory, and jurisdiction to enforce said provisions is hereby conferred on the United States courts therein: Provided, that in all cases where the laws of the United States and the said criminal laws of Arkansas have provided for the punishment of the same offenses the laws of the United States shall govern as to such offenses: And provided further that the United States Circuit and District Courts, respectively, for the Western District of Arkansas, and the Eastern District of Texas, respectively, shall continue to exercise exclusive jurisdiction as now provided by law in the Indian Territory as defined in this act, and in their respective districts as heretofore established, over all crimes and misdemeanors against the laws of the United States applicable to the said territory, which are punishable by said laws of the United States by death or by imprisonment at hard labor, except as otherwise provided in the following sections of this act."

Section 31 of the same act as follows:        ,

That certain general laws of the state of Arkansas in force at the close of the session of the General Assembly of that state of eighteen hundred and eighty-three, as published in eighteen hundred and eighty-four in the volume known as Mansfield's Digest of the Statutes of Arkansas, which are not locally inapplicable or in conflict with this act or with any law of Congress, relating to the subjects specially mentioned in this section, are hereby extended over and put in force in the Indian Territory until Congress shall otherwise provide.    *    *    *

"The Constitution of the United States and all general laws of the United States which prohibit crimes and misdemeanors in any place within the sole and exclusive jurisdiction of the United States, except in the District of Columbia, and all laws relating to national banking associations shall have the same *force* and *effect*

in the *Indian Territory* as elsewhere ·in the United States; but nothing in this act shall be so construed as to deprive any of the courts of the civilized nations of exclusive jurisdiction over all cases arising wherein members of said nations, whether by treaty, blood or adoption, are the sole parties, nor so as to interfere with the right and power of said civilized nations to punish said members for violation of the statutes and laws enacted by their national councils where such laws are not contrary to the treaties and laws of the United States."

Section 4 of the act of March 1, 1895, c. 145, 28 Stat. 693, in part reads as follows:

"\* \* \* The provisions of chapter forty-five of Mansfield's Digest of the General Laws of Arkansas, entitled 'Criminal Law,' except as to crimes and misdemeanors mentioned in the proviso of this section, and chapter forty-five of said Laws of Arkansas, contained in said digest, entitled 'Criminal Procedure,' and chapter ninety-one of said General Laws, regulating the jurisdiction and procedure before justices of the peace in civil cases, be, and they are hereby, extended and put in force in the Indian Territory; and the jurisdiction to enforce said provisions is hereby conferred upon the United States court in the Indian Territory: Provided, that in all cases where the *laws of the United States and the said criminal laws of Arkansas have provided for the punishment of the same offenses the laws of the United States shall govern as to said offenses,* except for the crime of larceny, the punishment for which shall be that prescribed by the laws of the state of Arkansas, any law in force in said territory to the contrary notwithstanding. \* \* \*"

Section 9 of the same act is in part as follows:

"That the United States court in the Indian Territory shall have exclusive original jurisdiction of all offenses committed in said territory, of which the United States court in the Indian Territory now has jurisdiction, and after the 1st day of September, eighteen hundred and ninety-six, shall have original exclusive jurisdiction of all offenses against the laws of the United States, committed in said territory, except such cases as the United States court at Paris, Texas, Fort Smith, Arkansas, and Fort Scott, Kansas, shall have acquired jurisdiction of before that time; and shall have such original jurisdiction of civil cases as is now vested in the United States court in the Indian Territory and appellate jurisdiction in all cases tried before said commissioners, acting as

justices of the peace where the amount of the judgment exceeds twenty dollars. * * *"

The Attorney General of the United States on December 20, 1907, in a communication to the United States attorney for the Eastern District of Oklahoma relative to the Robert Thompson Case, which was pending on indictment for murder in the United State court for the Central District of the Indian Territory at South McAlester at the time of the admission of the state into the Union, said:

"By section 31 of the act of May 2, 1890, c. 182, 26 Stat. 81, it was specially provided that 'all general laws of the United States which prohibit crimes and misdemeanors in any place within the sole and exclusive jurisdiction of the United States * * *shall have the same force and effect in the Indian Territory as elsewhere in the United States.' While it is not entirely clear that under this statute it was intended to extend these laws to all parts of the territory as distinct from those places of exclusive federal jurisdiction, such as military or Indian reservations. to which they would have extended even within a state, it would in any ( ent appear that, in so far as the jurisdiction of the federal court depended solely on the fact that the offense was committed within the territory, it would not have been cognizable in a federal court if committed within a state or if this particular territory had been a state when the offense was committed, but would be an offense coming within a local law for the government of the territories, the prosecution of which should be continued in the state courts after the admission of such territories as a state. I am, therefore, inclined to the view, expressed in Judge Campbell's opinion in the Thompson Case, that jurisdiction did not pass to the federal court, if, as appears in your letter, the indictment was based solely upon section 5339 of the Revised Statutes (U. S. Comp. St. 1901, p. 3627).

We conclude that Congress intended, in providing for the transferring of cases pending in the territorial courts of Oklahoma and the United States courts of the Indian Territory at the time of the admission of the state into the Union, that each should be considered as if a state government existed at the time of the commission of the alleged offenses, and if in that condition it would have been cognizable in the federal courts, then the same should be transferred to such courts, otherwise to be prosecuted to a final

determination in the state courts. *United States v. McBratney,* 104 U. S. 621, 26 L. Ed. 869; *Moore v. United States,* 85, Fed. 465 29 C. C. A. 269; *United States v. Kagama,* 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 230; *Ward v. United States,* 28 Fed. Cas. 397, No. 16,639; *Ward v. Race Horse,* 163 U. S. 505, 16 Sup. Ct. 1076, 41 L. Ed. 244; *United States v. Baily,* 24 Fed. Cas. 937, No. 14,495; *State v. Doxtater,* 47 Wis. 278, 2 N. W. 439; *Draper v United States,* 164 U. S. 248, 17 Sup. Ct. 107, 41 L. Ed. 419.

By section 4 of the act of March 1, 1895, c. 145, 28 Stat. 693, the criminal laws of Arkansas, with the proviso that in all cases where the laws of the United States and the said criminal laws of Arkansas have provided for punishment of the same offenses the laws of the United States shall govern as to said offenses, except for the crime of larceny, the punishment for which shall be that prescribed by the laws of the state of Arkansas, were extended to and put in force entirely over the Indian Territory.

Said section 4 is virtually a re-enactment of section 33 of May 2, 1890, c. 182, 26 Stat. 96, with the exception of the proviso in said section 33 to the effect that the United States Circuit and District Courts, respectively, for the Western District of Arkansas and the Eastern District of Texas, respectively, should continue to exercise their exclusive jurisdiction as then provided by law in the Indian Territory as defined in that act over all crimes and misdemeanors against the laws of the United States applicable to said territory which were punishable by said laws of the United States by death or imprisonment at hard labor, etc.

By section 9, Act March 1, 1895, *supra,* it was provided that the United States courts of the Indian Territory should have jurisdiction of such offenses, except as to cases of which the federal courts at Paris, Tex., Ft. Scott, Kan., and Ft. Smith, Ark., had before September 1, 1906, acquired jurisdiction. It is clear that said section 5339 of the Revised Statutes of the United States for the crime of murder was intended to be put in force over the Indian Territory entirely, and particularly over its entire area without regard as to whether it was a fort or an Indian reservation. Had it been treated as an entire Indian reservation, said laws as to

murder, etc., would have been in force over same by virtue of section 2145, Revised Statutes of the United States, and, should the Indian title of any reservation become extinguished, such laws then extended over same by virtue of said section 2145, *supra,* would have become inoperative as to such area. However, said section 5339, by the act of May 2, 1890, *supra,* was put in force over the entire Indian Territory regardless of whether it was a fort or an Indian reservation, and under no contingency could it become inoperative in its effect. *Bates v. Clark,* 95 U. S. 204, 24 L. Ed. 471 ; *Buster v. Wright,* 135 Fed. 947, 68 C. C. A. 505.

On May 2, 1890, the laws of the United States, by virtue of section 2145 of the Revised Statutes, were in force in all forts, Indian reservations, and places of such exclusive jurisdiction in the Indian Territory, and section 31 of the said act extended to and put in force the Constitution and all the laws of the United States throughout the Indian Territory, and thereafter sections 4 and 9 of the act of March 1, 1895, are virtual re-enactments of sections 31 and 33 of said Act of May 2, 1890, Congress thereby utilizing both the laws of the United States and certain laws of Arkansas to regulate and control, specially and mediately and directly, local conditions therein. *Ex parte Larkin,* 1 Okla. 53, 25 Pac. 745, 11 L. R. A. 418 ; *Ex parte Pridgeon,* 153 U. S. 48, 14 Sup. Ct. 746, 38 L. Ed. 631 ; *Cherokee Tobacco Co. v. United States,* 78 U. S. 624, 20 L. Ed. 228.

Then, again by adopting the literal meaning of the words, "prosecutions for all crimes and offenses committed within the territory or in the Indian Territory, pending  *  *  *  in the United States courts in the Indian Territory upon the admission of such territories as a state, *had they been committed within a state,* would have been cognizable in the federal courts, shall be transferred to and proceeded with in the United States Circuit or District Court established by this act,  *  *  *  in the same manner and in the same effect as if they had been committed within a state"—the same conclusion as to jurisdiction is reached. *Wing v. Chicago & N. Y. Ry. Co.,* 1 S. D. 458, 47 N. W. 530; *Dorne v.*

*Richmond Silver Mining Co.,* 1 S. D. 21, 44 N. W. 1021.

In the case of *United States v. McBratney,* 104 U. S. 621, 26 L. Ed. 869, *supra,* the court says:

"But the act of Congress of March 3, 1875, c. 139, for the admission of Colorado into the Union, authorized the inhabitants of the territory to form for themselves out of said territory a state government, with the name of the 'State of Colorado,' which state, when formed, shall be admitted into the Union upon an equal footing with the original states in all respects whatsoever; and the act contains no exceptions of the Utes Reservation, or of jurisdiction over it. 18 Stat. pt. 3, p. 474. The provision of section 1 of the subsequent act of June 26, 1876, c. 147 (19 Stat. 61) that upon the admission of the state of Colorado into the Union, the laws of the United States, not locally inapplicable, shall have the same force and effect within the state as elsewhere within the United States, does not create any such exception. Such a provision has a less extensive effect within the limits of one of the states of the Union than in one of the territories of which the United States have sole and exclusive jurisdiction."

The act of March 3, 1875, necessarly repeals the provisions of any prior statute, or of any existing treaty, which are clearly inconsistent therewith. *Cherokee Tobacco Co. v. United States,* 11 Wall. (U. S.) 616, 20 L. Ed.227. Whenever upon the admission of a state into the Union, Congress has intended to accept out of it an Indian reservation, or the sole and exclusive jurisdiction over that reservation, it has done so by express word. *The Kansas Indians,* 5 Wall. (U. S.), 737, 18 L. Ed. 667; *United States v. Ward, supra.*

"The state of Colorado, by its admission into the Union by Congress upon an equal footing with the original states in all respects whatever, without any such exceptions as had been made in the treaty with the Ute Indians and in the act establishing a territorial government, has acquired criminal jurisdiction over its own citizens and other white persons throughout the whole of the territory within its limits, including the Ute Reservation, and that reservation is no longer within the sole and exclusive jurisdiction of the United States. The courts of the United States have therefore no jurisdiction to punish crimes within that reservation, unless so far as may be necessary to carry out such provisions of the treaty with the Ute Indians as remain in force. But that treaty contains

no stipulation for the punishment of offenses committed by white men against white men. It follows that the Circuit Court of the United States for the District of Colorado has no jurisdiction of this indictment, but according to the practice heretofore adopted in like cases, should deliver up the prisoner to the authorities of the state of Colorado to be dealt with according to law. *United States v. Cisna,* 1 McLean, 254 265, Fed. Cas. No. 14,795; *Coleman v. Tennessee,* 97 U. S. 509, 519, 24 L. Ed. 1118."

In the case of *Draper v. United States,* 164 U. S. 240, 17 Sup. Ct. 107, 41 L. Ed. 419, the court says:

"The assertion of jurisdiction in the courts of the united States over the crime of murder perpetrated by one not an Indian against one not an Indian is based on the fact that the offense was committed on an Indian reservation. The contention as to want of jurisdiction rests upon the proposition that, the Indian reservation being within the state, the courts of the state had alone cognizance of crimes therein done by others than Indians. To determine these conflicting contentions requires a brief examination of the legislation organizing the territory of Montana and which provided for the admission of the state into the Union.

"The territory of Montana was organized by the act of May 26, 1864, c. 95, 13 Stat. 85. Subsequently, in 1868, the Crow Indian reservation was created (15 Stat. 649), the land of which it was composed being wholly situated within the geographical boundaries of the territory of Montana. The treaty creating this reservation contained no stipulation restricting the power of the United States to include the land embraced within the reservation, in any state or territory then existing or which might thereafter be created. The law to enable Montana and other states to be admitted into the Union was passed February 22, 1889, 25 Stat. 676, c. 180. This act embraced the usual provisions for a convention to frame a Constitution, for the adoption of an ordinance directed to contain specified agreements, and provided that, upon the compliance with the ordained requirements, and the proclamation of the President so announcing, the state should be admitted on an equal footing with the original states. The question then is , has the state of Montana jurisdiction over offenses committed within its geographical boundaries by persons not Indian or against Indians, or did the enabling act deprive the courts of the state of such jurisdiction of all offenses committed on the Crow Indian Reservation, thereby divesting the stat *pro tanto* of equal

authority and jurisdiction over its citizens, usually enjoyed by the other states of the Union?

"*United States v. McBratney* is therefore decisive of the question now before us, unless the enabling act of the state of Montana contained provisions taking that state out of the general rule and depriving its courts of the jurisdiction to them belonging and resulting from the very nature of the equality conferred on the state by virtue of its admission into the Union. Such exception is sought here to be evolved from certain provisions of the enabling act of Montana which were ratified by an ordinance of the convention which framed the Constitution of the State. The provision relied on is as follows:

" 'Second. That the people inhabiting the said proposed state of Montana do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; that the lands belonging to citizens of the United States residing without the said state of Montana shall never be taxed at a higher rate than the lands belonging to residents thereof; that no taxes shall be imposed by the said state of Montana on lands or property therein belonging to or which may hereafter be purchased by the United States or reserved for its use. But nothing herein or in the ordinances herein provided for shall preclude the said state of Montana from taxing as other lands are taxed any land owned or held by an Indian who has severed his tribal relations and has obtained from the United States , or from any person, a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any act of congress containing a provision exempting the lands thus granted from taxation, but said last named lands shall be exempt from taxation by said state of Montana so long and to such extent as such act of Congress may prescribe.'

"The words in the foregoing provisions upon which the argument is based are the following: 'And said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.' This language has been considered in

several cases in the courts of the United States with somewhat contradictory results. *United States v. Ewing* (D. C.) 47 Fed. 809; *United States v. Partello* (C. C.) 48 Fed. 670; *Truscott v. Hurlburt Land & Cattle Co.*, 73 Fed. 60, 19 C. C. A. 374.

"As equality of statehood is the rule, the words relied on here to create an exception cannot be construed as doing so, if, by any reasonable meaning, they can be otherwise treated. The mere reservation of jurisdiction and control by the United States of 'Indian lands' does not of necessity signify a retention of jurisdiction in the United States to punish all offenses committed on such lands by others than Indians or against Indians. It is argued that as the first portion of the section in which the language relied on is found disclaims all right and title of the state to 'the unappropriated public lands lying within the boundaries thereof and of all lands lying within said limits, owned or held by an Indian or Indian tribes, and until the title thereof shall be extinguished by the United States, the same shall be and remain subject to the jurisdiction of the United States,' therefore the subsequent words 'and said lands shall remain under the absolute jurisdiction and control of the United States' are rendered purely tautological and meaningless, unless they signify something more than the reservation of authority of the United States over the lands themselves and the title thereto. This argument overlooks not only the particular action of Congress, as to the Crow Reservation, but also the state of the general law of the United States, as to Indian reservations, at the time of the admission of · Montana into the union.

"On April 11, 1882, c, 74, 22 Stat. 42, Congress confirmed an agreement submitted by the Crow Indians for the sale of a portion of their reservation, and for the survey and division in severalty of the agricultural lands remaining in the reservation as thus reduced. The act, however, provided that the title to be acquired by the allottees was not be be subject to alienation, lease or incumbrance, either by voluntary conveyance of the grantee or his heirs, or by the judgment, order, or decree of any court, but should remain inalienable and be not subject to taxation for the period of twenty-five years, and until such time thereafter as the President might see fit to remove the restriction.

"The policy thus applied to the Crow reservation subsequently became the general method adopted by Congress to deal with Indian reservations. In February, 1887, by a general law, Congress provided 'for the allotment of lands in severalty to Indians on the

various reservations, and to extend the protection of the laws of the United States and the territories over the Indians, and for other purposes.' Act Feb. 8, 1887, c. 119, 24 Stat. 388. The act in question contemplated the gradual extinction of Indian reserva-- tions and Indian titles by the allotment of such lands to the Indians in severalty. It provided, in section 6, 'that upon the completion of said allotments and the patenting of said lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they reside. But the act the same time put limitations and restrictions upon the power of the Indians to sell, incumber, or deal with the lands thus to be allotted. Moreover, by section 4 of the act of 1887, Indians not residing on a reservation, or for whose tribe no reservation had been provided, were empowered to enter a designated quantity of unappropriated public land and to have patents therefor, the right, however, of such Indian to sell or incumber being regulated by provisions like those controlling allotments in severalty of lands comprised within a reservation. From these enactments it clearly follows that at the time of the admission of Montana into the Union, and the use in the enabling act of the restrictive words here relied upon, there was a condition of things provided for by the statute law of the United States, and contemplated to arise where the reservation of jurisdiction and control over the Indian lands would become essential to prevent any implication of the power of the state to frustrate the limitations imposed by the laws of the United States upon the title of lands once in an Indian reservation, but which had become extinct by allotment in severalty, and in which contingency the Indians themselvs would hav passd under the authority and control of the state.

"It is also equally clear that the reservation of jurisdiction and control over the Indian lands was relevant to and is explicable by the provisions of section 4 of the act of 1887, which allowed nonreservation Indians to enter on and take patents for a certain designated quantity of public land. Indeed, if the meaning of the words which reserved jurisdiction and control over Indian lands contended for by the defendant in error were true, then the state of Montana would not only be deprived of authority to punish offenses committed by her own citizens upon Indian reservations, but also would have like want of authority for all offenses committed by her own citizens upon such portion of the public

domain, within her borders, as may have been appropriated and patented to an Indian under the terms of the act of 1887. The conclusion to which the contention leads is an efficent demonstration of its fallacy. It follows that a proper appreciation of the legislation as to Indians existing at the time of the passage of the enabling act by which the state of Montana was admitted into the Union adequatly explains the use of the words relied upon, and demonstrates that in reserving to the United States jurisdiction and control over Indian lands it was not intended to deprive that state of power to punish for crimes committed on a reservation or Indian lands by other than Indians or against Indians, and that a consideration of the whole subject fully answers the argument that the language used in the enabling act becomes meaningless unless it be construed as depriving the state of authority to it belonging in virtue of its existence as an equal member of the Union.'

Section 4, par. 2, of the Montana enabling act, Act Feb. 22, 1889, c. 180, 25 Stat. 676, is substantially the same in effect as the proviso in section 1 of the Oklahoma enabling act which reads as follows: ¯

"Provided, that nothing contained in the said Constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this act had never been passed."

The only other reservation as to jurisdiction in the Oklahoma enabling act is contained in the proviso of section 7 to wit:

"Provided, that nothing in this act contained shall repeal or affect any act of Congress relating to the Sulphur Springs Reservation as now )efined or as may be hereafter defined or extended, or the power of the Unitd States over it or any other lands embraced in the state hereafter set aside by Congress as a national park, game preserve, or for the preservation of objects of archaeological interest; and nothing contained in this act shall interfere with the rights and ownership of the United States in any land hereafter set aside by Congress as national park, game preserve, or other reservation, or in the said Sulphur Springs Res-

ervation, as it now is or may hereafter be defined or extended by law; but exclusive legislation, in all cases whatsoever, shall be exercised by the United States, which shall have exclusive control and jurisdiction over the same; but nothing in this proviso, contained shall be construed to prevent the service within said Sulphur Springs Reservation or national parks, game preserves, and other reservations hereafter established by law, of civil and criminal processes lawfully issued by the authority of said state, and said state shall not be entitled to select indemnity school lands for the thirteenth, sixteenth, thirty-third, and thirty-sixth sections that may be embraced within the metes and bounds of the national park, game preserve, and other reservation or the said Sulphur Springs Reservation, as now defined or may hereafter be defined."

By the same process of reasoning followed by the Supreme Court of the United States in cases of *United States v. McBratney, supra,* and *Draper v. United States, supra,* we conclude that the Congress, upon the admission of Oklahoma as a state, where it has intended to except out of such state an Indian reservation, or the sole and exclusive jurisdiction over that reservation, it has done so by express words. It is not contended that the alleged crime was committed on any such excepted reservation, or in any place where the United States has the sole and exclusive jurisdiction since the admission of the state. Now, mark you the language, "had they been committed within a state would have been cognizable in the federal courts," contained in section 16, as amended March 4, 1907, of the Oklahoma enabling act. Does not that mean in a state similarly circumstanced as one with enabling act like ours? When you consider this language in connection with section 39 of the same enabling act pertaining to Arizona and New Mexico, *supra,* it seems that Congress was recognizing the existing conditions and the bringing in of an organized and unorganized territory as one state, and that it was laying down the rule that if such offense had been committed after the admission of the state it would have been cognizable in the federal court, that then such Federal court would have jurisdiction; otherwise not. Any other conclusion can be reached only by reasoning against the apparent and reasonable literal mean-

ing. See, also, the following authorities heretofore cited: *Moore v. United States,* 85 Fed. 465, 29 C. C. A. 269; *United States v. Kagama,* 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 230; *Ward v. United States,* 28 Fed. Cas. 397, No. 16,639; *Ward v. Race Horse,* 163 U. S. 505, 16 Sup. Ct. 1076, 41 L. Ed. 244; *United States v.Baily,* 24 Fed. Cas. 937, No. 14,495; *State v. Doxtater,* 47 Wis. 278, 2 N. W. 439.

We necessarily conclude that the district court of the county of the state in which the offense was committed has jurisdiction of this offense.

In this case the United States Judge for the Eastern District held that the state court had jurisdiction of this prosecution, not the federal court, and directed the marshal to deliver the prisoner to the proper state authorities, and the respondent sheriff, acting under the instructions of his co-respondent, refused to receive him. Whereupon the respondent district judge refused to take jurisdiction of said cause or to make any order relative thereto. The said court should have taken jurisdiction.

A writ of mandamus is subject to the legal and equitable discretion of the court, and ought not to be issued in cases of doubtful right. But it is the only adequate mode of relief where an inferior tribunal refuses to act upon the subject properly before it. *Life Ins. Co. of N. Y. v. Heirs of Wilson,* 8 Pet. (U. S.) 291, 8 L. Ed. 949. There is no remedy for refusal to assume jurisdiction in this case except mandamus. The writ will be awarded, to be issued only on the further application of relator's counsel, if an order taking jurisdiction of said cause is not made in the court below upon advice of our conclusions.

All the Justices concur.